**ATLAS CHEMICAL INDUSTRIES, INC.,**
**Plaintiff,**

v.

**MORAINE PRODUCTS, INC., Defendant.**

**Civ. A. No. 35222.**

United States District Court,
E. D. Michigan, S. D.

Oct. 27, 1972.

**354**

Miller, Canfield, Paddock & Stone, Detroit, Mich., for plaintiff.

Cullen, Settle, Sloman & Cantor, Detroit, Mich., Allen H. Gerstein and Alvin D. Shulman, Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This is an action filed by the licensee of a Patent No. 3,422,189 to declare the patent invalid. The plaintiff claims by motion for summary judgment that the alleged invention was in public use more than one year prior to the date the patent application was filed. 35 U.S.C.A. Section 102(b). The defendant has filed a motion to dismiss based on the plaintiff's alleged fraud on the court and unclean hands, fraud on the patent office, and public injury caused by plaintiff's conduct in concealing information pertaining to prior use. As an alternative to dismissal, defendant asks that the plaintiff be ordered to pay the defendant's expenses and attorney fees incurred from the time the plaintiff began concealing information material to the patentability of the patent application. This would include the expenses incurred in the prosecution of the patent application, the prosecution of the interference proceedings and the expenses of the patent litigation both here and in

Chicago where the defendant is prosecuting an infringement suit. The motion is based on the concealment from the defendant by the plaintiff of information material to the patentability of the invention, including the issue of prior use, the subject of plaintiff's motion for summary judgment.

■ Both parties have treated the defendant's motions as motions for summary judgment, Federal Rules of Civil Procedure 12(b), and have called the court's attention to facts established by affidavits and depositions.

The issues before the court pursuant to Rule 56 of the Federal Rules of Civil Procedure are these.

Were the activities of the plaintiff Atlas and its predecessor as related to the defendant, the patent office and the court of the kind and character to require dismissal of this suit to declare invalid the patent?

If the answer is negative, was the invention "in public use or on sale in this country, more than one year prior to the date of the application for the patent?"

If the answer is affirmative, were the activities of the plaintiff Atlas and its predecessor as related to the defendant, the patent office and the court of the kind and character to require the plaintiff to reimburse the defendant for costs and expenses and other damage?

There is no dispute about the facts. All facts have been developed in discovery, and the depositions and affidavits disclose no genuine issue as to any material fact. Summary judgment on all matters is an appropriate remedy.

The patent in this suit (Rider patent) was issued January 14, 1969 on an application which was first filed on January 2, 1959. The patent is entitled "Method and Compositions for the Treatment of Gastrointestinal Disorders". The patent claims relate solely to the method of treating flatulency (gas) symptoms in humans with a specific antifoam composition. The claims do not cover the composition per se because that product had

been marketed commercially as "Antifoam A" by the Dow Corning Corporation and had been used as an antifoaming agent since 1946. The prior use relied upon by the plaintiff in its motion for summary judgment is the use of Antifoam A, the specific antifoaming agent employed by the patentee Rider in his work. The record is without dispute that during the summer and fall of 1957 a druggist named Bergstein in Midland, Michigan, marketed Antifoam A prepared by the Dow Corning Corporation as a method of treating intestinal gas in humans. It indicates without dispute that prescriptions for this product were filled, sold and the product was used by patients in Midland prior to January 2, 1958.

■ The druggist Bergstein's use of the compound was not experimental. The utility had been established. The product was prescribed by physicians, sold by Bergstein and used by patients to treat real physical disorders. Even if this use was experimental in the sense that Bergstein was collecting data on the results, it was a real use and would not fall within the class of experiments determined by New Jersey Wood Paving Company v. American Nicholson Pavement Company, 97 U.S. 126, 24 L.Ed. 1000 (1878), to be an exception to the effect of prior public use. Clearly under *New Jersey Wood Paving Company* (supra) and Monolith-Portland Midwest Co. v. Kaiser Aluminum, 267 F.Supp. 726 (1967), only experimentation by the patentee is an exception to the claim of prior public use. Magnetics, Inc. v. Arnold Engineering Co., 438 F.2d 72 (7th Cir. 1971). Only experimentation by the patentee supports a policy of encouraging thorough research rather than incomplete and premature disclosure. Use of the patented product by others, such as Bergstein's use, is not an experiment in the eyes of the law, it being by one not related in any way to the patentee. The record, however, is clear beyond any doubt that Bergstein's use was not experimental.

This court also finds that there is no genuine dispute about the identity of the substance used by Bergstein and the patentee. Although the product sold by Bergstein and prescribed by the doctors and used by patients is variously called Soxane and antifoam by different people and even by the same people, there is no doubt that the product was Dow Corning Antifoam A and that it contained MPS (methylpolysiloxane) and finely divided silica. The product was the same as that used by Doctor Rider. The use involved prescription, sale and ingestion by patients. The use was by the public, true a limited public in Midland, Michigan, but available for wider distribution and use. Simmons v. Hansen, 117 F.2d 49 (8th Cir. 1941).

Public use and sale more than one year prior to the application for the patent is established without dispute. Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc., 409 F.2d 99 (6th Cir. 1969); Hautow v. Kearney & Trecker Corporation, 191 F.Supp. 430 (E.D.Mich.1961).

■■ Defendant, however, contends in his motion to dismiss, treated by the parties and by the court as a motion for summary judgment, that the court cannot grant a summary judgment for the plaintiff declaring the patent invalid on such a record because of the wrongdoing on the part of the plaintiff, and that the plaintiff's claim should be dismissed. To dismiss this lawsuit which directly raises the question that the patent is not valid, would simply mean that this court or some court would face the same problem at a subsequent time in an infringement suit or a suit to recover royalties under the contract. This case has been in this court since the summer of 1970. A vast record has been made. All of the facts have been exposed. It would not be in the interest of the public, the parties or judicial administration to order a dismissal on this ground. It is clear that an invalid patent cannot be validated by estoppel or misconduct. Heath v. Frankel, 153 F.2d 369 (9th Cir. 1946); W.

E. Plechaty Co. v. Heckett Engineering, 145 F.Supp. 805 (N.D.Ohio 1956). A strong public policy militating against such nondeserving legal monopolies dictates this result. See Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Defendant also contends that if the case is not dismissed and if summary judgment for the plaintiff is granted, the court should, in exercise of its equity jurisdiction, order the plaintiff to pay to the defendant expenses and attorney fees incurred from and after the time of the plaintiff's wrongdoing and other damages.

The background of the controversy is this. Some time in 1958 Dr. Rider became convinced that an old and known composition MPS with finely divided silica (Dow Antifoam A) could be used with safety and efficacy to relieve flatulence in humans. Stuart Pharmaceutical, later acquired by Atlas, was interested in marketing such a product. Dr. Rider made no attempt to patent his discovery until after his meetings with Stuart. Shortly afterwards Stuart indicated to Dr. Rider that a patent application should be filed. After the application was filed, a contract was entered into between Rider, Moraine (the organization set up to market the Rider patent) and Stuart, wherein the Rider patent was assigned to Stuart, and Stuart agreed to pay a 5% royalty, whether or not a U.S. patent was obtained. Shortly thereafter Stuart introduced products containing the item.

At about the same time, a representative of Plough, Inc., notified Stuart that a person by the name of Feinstone had filed an application for a patent which Plough believed covered the products marketed by Stuart, and that a patent would soon be issued on that application. After review of the matter, Stuart concluded that the patents were not of the same product, the Plough patent being

for the use of MPS alone, whereas the Rider patent called for the use of MPS and finely divided silica. This was called to the attention of Moraine. Stuart was now confronted with having to pay royalty to both Moraine and Plough.

During 1960, a patent was issued to William C. May and assigned to Dow Corning. The May patent was directed to the use of MPS and finely divided silica, the same as the Rider patent application. Interference action was initiated which Rider won. Dow indicated to Stuart that it had no intention of enforcing the May patent because of its interest in selling the raw material to any company making the products in the treatment of flatulence.

Faced with the obligation of paying two royalties, to both Moraine and Plough, where it originally had only to pay one, Stuart rescinded the agreement with Moraine. The grounds for such rescission lacked merit and appeared to be made to intimidate Moraine into a compromise. Moraine sued Atlas, the successor to Stuart. The suit was settled with a new option agreement whereby Atlas was given the option to the exclusive license under the Rider patent, if a patent was issued. Atlas had the exclusive right to sub-license others. Moraine was to enforce the patent against infringers designated by Atlas and, if Moraine refused to enforce the patent, Atlas was absolved as to its responsibility for paying royalties. Atlas was to pay a 2% royalty on its products containing MPS and finely divided silica.

Immediately after the rescission of the contract with Moraine, Stuart entered into a license agreement with Plough under the Feinstone patent. Moraine was not kept advised of Stuart's actions in connection with Plough. The contract between Stuart and Plough called for payment of a 5% royalty to Plough with the understanding that any royalty payments not to exceed 2% made by Stuart to others on the same product could be deducted from the royalty payments to Plough.

In March 1961, Atlas and Plough learned that Leonard Bergstein had been marketing MPS containing finely divided silica product in Midland, Michigan, to relieve flatulence in humans. Plough told Bergstein that he was infringing the Plough-Feinstone patent and demanded that Bergstein stop selling his product. Pursuant to its agreement with Atlas, Plough refused to grant Bergstein a license. In January 1963, Bergstein wrote Stuart in an attempt to get permission for a license under the Feinstone patent. This letter states clearly on its face some of the history regarding Bergstein's early use of the product. Plough and Atlas were in close consultation as to how to handle the Berstein problem. On January 21, 1963, a memorandum from Plough to Atlas sets forth Bergstein's contention, including the sale of antifoam in liquid suspension form in 1957. As of January 1963, Atlas was fully aware of the possibility of public use of the product by Bergstein in 1957 for the purposes outlined in the claims in the Rider patent. On February 1, 1963, Bergstein informed Atlas that they could verify this use from his sales records, from local physicians and from the Dow Corning Corporation. Atlas never told Moraine or the patent office what Atlas knew about the Bergstein use.

Atlas was at this time the holder of an option to become an exclusive licensee under the Rider patent, and yet on January 31, 1962, Atlas stated in an internal memorandum, "We have serious doubts that a valid Rider patent will issue. This is in part because of certain information regarding prior uses that we have that is not available to the patent office."

After Rider won the interference suit against May, it became obvious that a patent would soon issue to Rider. Atlas, the holder of the exclusive license under such a patent, indicated in an internal memorandum, "We want to play Moraine and Plough off against each other in an effort to get the royalties reduced." After exercising its option, an

option that cost Atlas nothing because it could subtract the payments to Moraine from the payments to Plough, Atlas demanded that Moraine protect the patent by bringing infringement action against Plough. This action is pending in Chicago. Atlas insisted that Moraine was under an obligation to proceed diligently in the protection of the patent. Atlas insisted that Moraine had no right to settle the lawsuits against the alleged infringers without Atlas' written approval.

Finally, just before Atlas filed this suit against Moraine, Atlas stopped paying royalties to Moraine under the license agreement. This step was taken shortly after Atlas had renegotiated its agreement with Plough to reduce the royalty payments from 5% to 3%, the amount that Plough was actually receiving from Atlas at that time because of the payment of 2% to Moraine. As a result of the ceasing to pay royalties to Moraine, Atlas reduced its total royalty cost on the products from 5% to 3%. Plough continued to get its 3% as it had before and Moraine took nothing. The Atlas president explained this by indicating that until the agreement for royalties to Plough could be reduced to correspond to the amounts actually being paid to Plough, it was not in the interest of Atlas to tackle Moraine and to have the Moraine patent declared invalid. The president indicated that so long as it didn't cost Atlas anything, there wasn't any point in undertaking a lawsuit to defeat the patent.

The record in this case is without dispute, that as long ago as February 1, 1963, the plaintiff or its predecessor was encouraging the defendant in connection with its prosecution of its patent having knowledge of the fact that the patent was defective because of prior use. In spite of the fact that Atlas had knowledge of the prior use, it exercised its option under a license agreement obtaining the right to enforce the patent against the competitors of Atlas. The defendant therefore had to defend all infringement suits for and on behalf of Atlas, all during a time when Atlas had knowledge of the fact that the patent was invalid. Atlas deliberately took steps which it knew or should have known would compel Moraine to enforce the patent against the only significant competition. The record is clear that the conduct of Atlas during this period was unconscionable, contending on the one hand that it wanted no part in the enforcement of the patent because of doubts Atlas had as to its validity, yet compelling the defendant to diligently enforce the patent against its competition. The action of Atlas was a disdain of the public interest against the enforceability of patents of questionable validity.

"Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue . . . this duty is not excused by reasonable doubts as to the sufficiency of the proof of the inequitable conduct nor by resort to independent legal advice. Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence."

Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Company, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945).

"We agree with the Commission that, because of its strong economic interest in having Pfizer awarded a patent, the fruits of which Cyanamid would share under the cross-licensing agreement, Cyanamid was under the same duty as Pfizer to reveal to the Patent Office information which it had reason to know was material to Pfizer's application."

Charles Pfizer & Co. v. F. T. C., 401 F.2d 574, 583 (6th Cir. 1968).

Although dismissal of the complaint has already been indicated to be an inappropriate remedy, the court is not powerless to afford at least some protection to the defendant. Certainly Moraine should be made as whole as possible. Atlas should be required to pay damages to Moraine. The fact that Atlas "acted affirmatively to magnify and increase those effects" Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Co., supra, point up the need for this type of relief.

The remedy shaped in Pfizer v. F. T. C., a case having similar overtones of improper action on the part of the licensee in the failure to disclose information was to compel cross-licensing. In this case this remedy would not be appropriate, the patent having been held not valid. The appropriate remedy is to attempt to make the defendant whole.

It is also claimed that the plaintiff should be required to pay to the defendant the royalties due during the period from date of cancellation of the license agreement until the present. On the surface this appears to be foreclosed by Lear, Inc. v. Adkins, 395 U.S. 653, 89 S. Ct. 1902, 23 L.Ed.2d 610 (1969), although Troxel Manufacturing Co. v. Schwinn Bicycle Company, 6 Cir., 465 F. 2d 1253, 1972, indicates that had such royalty payments been paid, they could not have been recovered by Atlas.

In its complaint plaintiff offered to pay in escrow, the royalties to be distributed as ordered by the court.

■ *Lear* does not face the problem of a licensee that is dealing unfairly with the licensor, the court, the patent office or the public. *Troxel* permits the licensor to keep the royalties when they have been paid during the course of litigation. In a case in which royalties are tendered in escrow and in which plaintiffs have been found not to have been candid and open in dealing with its licensor and the patent office, it does not seem unreasonable to order the deposited funds to be turned over to the defendant or if they have not been so deposited to require the plaintiff to account to the defendant for the royalties to the present, the date on which the patent has been declared invalid. This is not contrary to *Lear* for the fact situations are substantially different.

■ The court finds that there is no genuine issue as to any material fact as to the following:

1. The patent was in prior public use during 1957 more than one year prior to the filing of the application.

2. Atlas has acted unconscionably in dealing with Moraine after it had notice of prior public use by Bergstein.

3. Atlas has injured Moraine by its failure to be candid and open with Moraine and with the patent office as is required of an option holder of an exclusive license agreement.

The injury to Moraine consists of the following:

1. Costs and expenses of Moraine in prosecuting the patent since January 1963.

2. Costs and expenses of Moraine in prosecuting the interference proceedings since January 1963.

3. Costs and expenses of Moraine in defending the patent against alleged infringers.

4. All other costs and expenses related to the above three matters.

5. Loss of royalties from date of termination of royalty payments to this date.

The costs and expenses in connection with this lawsuit are not a part of the damages suffered by Moraine because it is in this suit that the very issues raised by knowledge of prior use are litigated.

The defendant Moraine is directed to prepare an order to this effect retaining jurisdiction in the court as to these matters and to provide a procedure whereby the proof can be made of the items indicated and to present the order to the court for signature.