**CRANE CO., Plaintiff,**

v.

**AEROQUIP CORPORATION, Defendant.**

Nos. 72 C 1403, 72 C 2755.

United States District Court, N. D. Illinois, E. D.

March 13, 1973.

Henry L. Brinks and James B. Blanchard, Hume, Clement, Hume & Lee, Chicago, Ill., and Norman Pacun and George S. Schwind, New York City, for plaintiff.

William J. Stellman and William A. VanSanten, Hofgren, Wegner, Allen, Stellman & McCord, Chicago, Ill., Don K. Harness, Harness, Dickey & Pierce, Detroit, Mich., and Jerry K. Harness, Aeroquip Corp., Jackson, Mich., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

These consolidated civil actions arise out of the settlement of an earlier patent infringement action between the same parties (Civil Action No. 67 C 988). In settlement of the foregoing civil action, plaintiff, Crane Co., and defendant, Aeroquip Corporation, negotiated a license agreement by the terms of which Crane granted to Aeroquip an exclusive license under United States Letters Patent No. 2,933,333 (the subject of the 1967 infringement action, hereinafter "the suit patent" or "the '333 patent"). In turn, Aeroquip agreed to pay royalties to Crane on certain "couplings" sold by Aeroquip under the suit patent. The license agreement became effective June 1, 1968, and a consent judgment, declaring the '333 patent valid as between the parties, was entered on June 12, 1968.

The product manufactured and marketed under the patent license by defendant is identified as the Aeroquip 5700 Series Coupling and is used as a refrigerant coupling for fully precharged residential airconditioning systems. In either 1969 or 1970,[1] defendant Aeroquip initiated the manufacture and sale of "modified" 5700 Series couplings. Although there is some dispute as to defendant's intention to do so, the "modified" couplings were marked with the suit patent number. Aeroquip has refused to pay any royalties on the "modified" couplings.

On October 15, 1971, a representative of plaintiff inquired of defendant by letter as to the reason why royalty payment under the exclusive license agreement had substantially declined. Defendant answered by letter on December 16, 1971, that a design [the "modified" couplings] "which [had] been sold for over two years" and represented "by far, the largest percentage of sales" was "not covered by the licensed patent".

Section 7 of the exclusive license agreement sets forth the provisions governing the terms of the exclusive license. That section states:

"(a) This Agreement shall terminate upon the expiration of said patent.

"(b) Should AEROQUIP fail to make payments as provided in Sections 3 and 4, CRANE shall have the right to terminate the exclusive license under Section 2 of this Agreement upon sixty (60) days' notice of its intention to do so and to elect a nonexclusive license grant, providing, however, that AEROQUIP shall have the right to pay the sum due within said sixty (60) days period to prevent the exclusive license under this agreement from being terminated. In the event of termination of the exclusive

---

1. Plaintiff's memorandum states that manufacture began in 1969, although the complaints in both cases state that defendant "at least as early as September 1970 . . . began to make, use and sell 'modified' couplings . . . ." The complaints further allege that plaintiff did not learn of the "modified" coupling or defendant's refusal to pay royalties on it until "on or about December 20, 1971".

license under this Agreement by CRANE, AEROQUIP shall not be relieved of its obligation for the payments as provided in Sections 3 [2] and 4.

"(c) In the event that AEROQUIP shall become bankrupt or make any arrangement with its creditors, or go into liquidation, CRANE shall have the right in every such case, by notice in writing, to terminate this Agreement."

Accordingly, by letter dated June 2, 1972, and based upon Aeroquip's refusal to pay royalties on the "modified" 5700 Series couplings, Crane gave notice in writing to Aeroquip under Section 7(b) of the license agreement of Crane's intention to terminate Aeroquip's exclusive license and to elect a nonexclusive license. On June 8, 1972, Crane commenced Civil Action 72 C 1403 seeking damages for Aeroquip's alleged breach of the exclusive license agreement by failing to pay royalties on the "modified" 5700 Series couplings.[3] Defendant answered by denying that the modified couplings infringe the '333 patent and seeking a declaration that said patent is void and unenforceable. On June 20, 1972, the minimum annual royalty of $25,000 became due pursuant to Sections 3(b) and 5(b) of the license agreement. When Aeroquip failed to tender payment of the minimum royalty, Crane, by letter dated July 18, 1972, again gave notice under section 7(b) of its intention to terminate the exclusive license and elect a non-exclusive license. Payment of the minimum royalty due on June 20, 1972, was tendered by Aeroquip to Crane on September 15, 1972, within 60 days of the July 18th notice. A similar tender of the royalties due on September 20, 1972, was made on September 25th. The royalties tendered by Aeroquip did

not include any amount accounting for sales of the "modified" couplings.

By letter dated October 11, 1972, Crane gave notice of termination of the license agreement on the alleged ground that Aeroquip's conduct with regard to the license agreement, including Aeroquip's failure to pay royalties which Crane asserted to be required thereunder, and Aeroquip's unqualified denial of the validity of the '333 patent, constituted repudiation of the agreement. With the foregoing letter Crane returned the checks tendered by Aeroquip in satisfaction of what Aeroquip alleges were its royalty obligations under the exclusive license agreement.

On November 1, 1972, Crane filed Civil Action No. 72 C 2755, seeking injunctive and declaratory relief and damages for infringement by Aeroquip of the '333 patent on the ground that the license agreement had been terminated by the October 11th letter.[4] Defendant answered by denying that the agreement had been terminated and counterclaiming for specific performance of the license agreement.

On plaintiff's motion, the two cases were consolidated for consideration by this court.

Four motions are presently pending before this court. First, Crane Co. has moved for partial summary judgment adjudging that the exclusive license agreement of June 1, 1968, was terminated by plaintiff's written notice of termination dated October 11, 1972. Second, defendant Aeroquip has moved this court for a preliminary injunction enjoining Crane Co., pending the outcome of 72 C 1403, from granting a license under the '333 patent to any third party or "making, using or selling couplings embodying the invention of said patent" or "taking any other action in

---

2. Section 3(3) provides: "AEROQUIP shall pay CRANE, in any event, a minimum royalty in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each year of the Agreement."

3. Jurisdiction over the subject matter of 72 C 1403 is based upon diversity of citizenship.

4. Jurisdiction in 72 C 2755 is based upon federal statute. See 35 U.S.C. §§ 271, 281 et seq.

derogation of defendant's rights under the agreement of June 1, 1968" or prosecuting in 72 C 2755 its claim for infringement. Third, Crane has moved for partial summary judgment for royalties allegedly due and owing Crane on Aeroquip's sale of "modified" couplings, marked with the suit patent number, prior to Crane's filing of a complaint in 72 C 1403. Finally, Crane has moved that this court compel Aeroquip to answer certain interrogatories concerning the sale of all couplings allegedly covered by the patent.

*Motion for Partial Summary Judgment Terminating the License Agreement*

Crane has moved this court to adjudicate the license agreement as being terminated based upon the undisputed facts presently before the court. Essentially, Crane argues that its letter of October 11, 1972, was effective in terminating the exclusive license agreement because Aeroquip's prior course of conduct amounted to a material breach of the agreement and an anticipatory repudiation of it. Aeroquip contends that it has in all respects complied with the terms of the agreement and that Crane's unilateral action terminating the agreement was ineffective.

■■ At the outset, it is important to recognize that:

"The motion for summary judgment, authorized by rule 56 Federal Rules of Civil Procedure, 28 U.S.C.A., which in effect legalizes the 'speaking' demurrer, has an important place in providing a prompt disposition of cases which have no possible merit and in preventing undue delays in the trial of actions to which there is no real defense; but it should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. [Citing cases.] And this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn there-

from." Stevens v. Howard D. Johnson, 181 F.2d 390, 394 (4th Cir. 1950). Hence, in deciding whether plaintiff is entitled to partial summary judgment here, the court is limited to considering only the undisputed facts and may not indulge in making inferences without giving the parties a complete hearing.

The undisputed facts are that Aeroquip has challenged the validity of the '333 patent; that it manufactured and sold, apparently without notice to Crane, "modified" couplings, some of which were marked with the patent number; and that it tendered royalty payments after the time they were due. There is, of course, no dispute that the parties to this lawsuit entered into a written agreement which is part of the record before the court. The disputed factual issues are whether the '333 patent is valid and whether the "modified" couplings, putting aside the marking estoppel issue, infringe the '333 patent.

Turning to the agreement itself, there can be little doubt that, based upon the *undisputed* facts, there has not been any breach of its specific terms. Section 7 of the agreement, *supra*, sets forth the circumstances under which the agreement can or will be terminated. The undisputed facts do not suggest that any of those circumstances exist here. The patent has not expired (Section 7(a)). All royalties that were *undisputably* due were tendered within sixty days of Crane's notice of its intention to terminate (Section 7(b)), and there is no indication that Crane is either bankrupt, in liquidation or proceeding under an arrangement with creditors. Furthermore, there is no forfeiture clause in the agreement. Hence, Crane's October 11th letter was not sufficient under any provision of the license agreement to terminate the license.

However, Crane asserts that under general contract principles, Aeroquip's wilful conduct was sufficient, as a matter of law, to constitute a material breach if the contract and/or a repudiation of it. Under such circumstances,

Crane argues, its unilateral action in terminating the agreement was effective. In support of its theory, Crane cites Aeroquip's (1) challenge to the validity of the patent (and, in essence, the 1968 consent decree); (2) its manufacture of the "modified" couplings without notice to plaintiff, even though they had been marked with the patent number; (3) the refusal to pay royalties on the "modified" couplings and (4) the failure to tender payment of royalties until after they were past due under the agreement. Crane states that all of the foregoing acts or omissions constitute conclusive evidence of Aeroquip's bad faith, unfair dealing, and intent to repudiate the contract.

While the court does not wish to be understood as stating any position as to the ultimate merits of Crane's theory, it is the opinion of this court that in light of the public policy concerns expressed by the Supreme Court in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), and the overall importance of the patent validity and infringement issues to the ultimate resolution of the license-validity issue, partial summary judgment adjudicating the license terminated would be both improvident and premature at this time.

▮▮▮ Although the authority is somewhat insubstantial, the general rule of this Circuit appears to be that the mere failure to pay royalties is not, absent a specific provision in the license, sufficient to allow the licensor to unilaterally terminate the license. United Mfg. & Service Co. v. Holwin Corp., 187 F.2d 902, 905 (7th Cir. 1951); Carr v. Jaeger Machine Co., 69 F.2d 434, 435 (7th Cir. 1934); Chadeloid Chemical Co. v. Johnson et al., 203 F. 993, 996 (7th Cir. 1913); Comptograph Co. v. Burroughs Adding Machine Co., 175 F. 792 (N.D.Ill.1909). With respect to the other alleged grounds for termination, irrespective of their merits as a matter of contract law, the policy considerations found to be determinative in the Lear case should have equal force here. Basically, Crane's contention is that Aero-

quip's repudiation of the validity of the patent and its manufacture, sale and marking of the "modified" couplings, without payment of royalties thereon, are sufficient grounds for Crane to unilaterally terminate the license. Certainly the aforesaid facts would as a matter of contract law be persuasive support for Crane's argument. However, as the Court stated in Lear:

"Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." Lear, Inc. v. Adkins, 395 U.S. 653, 670–671, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969).

Although the facts and issues in Lear required the court to go no further than to hold that the doctrine of licensee estoppel would no longer be a defense available to licensors and that a licensee would be able to challenge the validity of the patent without having to continue paying royalties or, in effect, having the license contract strictly enforced against it during the pendency of the litigation, the rationale of Lear must surely extend to the converse situation raised in this case. Instead of being asked to enforce the contract, even though the licensee has raised the validity defense, Crane has asked this court to adjudicate the license as terminated essentially because the licensee has raised the validity defense. Yet, just as the imposition of the doctrine of licensee estoppel would have a chilling effect on meritorious chal-

lenges to patents, as well as ultimate competition with the licensee, so would the threat of termination of the license have a similar effect.

■■ If raising the defense of validity were sufficient grounds for terminating a license, then licensees might hesitate to challenge a patent because of the potential sanction in doing so. Nor does Aeroquip's sale of "modified" couplings marked with the patent number change the result.[5] For purposes of allowing challenges to the validity of a patent, the marking estoppel doctrine should not have any greater effect than the doctrine of licensee estoppel. As Chief Judge Swygert stated in Beckman Instruments, Inc. v. Technical Develop. Corp., 433 F.2d 55, 59 (7th Cir. 1970):

> "Defendants attempt to distinguish the doctrines of licensee estoppel and estoppel by marking by suggesting that the former is based on principles of contract law, while the latter has its basis in equity. But defendants' arguments in support of each of these doctrines sound very similar, namely, that it is unfair for licensees to use the patent and accept the benefits of the license and then attack the validity of the patent. However, the Supreme Court in Lear rejected such arguments when applied to the licensee estoppel doctrine, and we think the Court's reasoning extends to the doctrine of estoppel by marking as well. Defendants have not suggested any reason why the 'strong federal policy' in favor of encouraging challenges to invalid patents should not apply when there has been marking with the patent number. Perhaps it is true that such marking provides the licensee with additional protection from competitors, thus making it seem all the more unfair to allow him to repudiate his obligations. However, it must be noted that the Supreme Court in Lear conceded that patent invalidity does

not amount to total failure of consideration, but nonetheless held that patent invalidity must be made a complete defense to the obligation to pay royalties. We cannot say that the additional consideration or 'benefit' flowing to the licensee who marks his products with the patent number is sufficient to make the Lear case and its policy rationale inapplicable."

■ Crane argues that if this court fails to allow termination of the agreement, Aeroquip will maintain a monopoly it has gained in the "modified" couplings while at the same time suppressing Crane's patented couplings. Notwithstanding the probable validity of Crane's assertion, the fact remains that Crane is the government licensed monopolist (the patentee) and the strong public policy in favor of promoting judicial tests of patents, especially by licensees who have the most incentive to do so, outweighs any hardship caused by the temporary suppression of Crane's monopoly. As the Supreme Court stated in Blonder-Tongue v. University Foundation, 402 U.S. 313, 345, 91 S.Ct. 1434, 1451, 28 L.Ed.2d 788 (1971):

> "The holding that licensee estoppel was no longer tenable was rooted in the second line of cases eliminating obstacles to suit by those disposed to challenge the validity of a patent. 395 U.S., at 663–668 [89 S.Ct. 1902]. Moreover, as indicated earlier, we relied on practical considerations that patent licensees 'may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery.' 395 U.S., at 670 [, 89 S.Ct. 1902]."

■ Hence, this court believes that a full hearing on the merits of the patent validity and infringement issues is necessary before any final determination as to the continuing validity of the agreement can be made. Accordingly, plain-

---

5. Of course, the simple fact that the modified couplings were manufactured and sold by Aeroquip without notice to Crane is insufficient to demonstrate repudiation of the license agreement *absent proof* that the modified couplings infringed the patent and Aeroquip had reason to believe they would.

tiff's motion for partial summary judgment, adjudicating the exclusive license agreement terminated, will be denied.

*Motion for a Preliminary Injunction*

■ Defendant Aeroquip has moved for a preliminary injunction enjoining plaintiff, pending the final outcome of Civil Action No. 72 C 1403, from granting any license to any third party under the suit patent, or making, using and selling couplings embodying the invention or any other action in derogation of defendant's rights, or prosecuting its action for infringement in Civil Action No. 72 C 2755.

■ While defendant is perfectly correct in stating that the general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action after a full hearing, such action cannot be taken unless the moving party has shown (1) that it is likely it will succeed on the merits; (2) that if the adverse party is not enjoined, the moving party will suffer irreparable harm; and (3) that an award of monetary damages will be inadequate. See, Moore's Federal Practice ¶ 65.04[1] et seq. No such showing has been made here. First, plaintiff's infringement action has been consolidated with its contract action. Therefore, both will proceed simultaneously. Furthermore, the question of breach of contract turns, at least to a certain extent, upon the question of whether Aeroquip's "modified" couplings are covered by (or infringe) the patent. Hence, to suppress the question of infringement "pending the outcome" of the contract action would be absurd. Secondly, Aeroquip has not satisfied its burden of showing irreparable harm, inadequacy of damages, or a likelihood of success on the merits. All it has attempted to show is that it did not breach the contract, and, therefore, Crane should be enjoined from breaching it pending the outcome of this litigation. There is a strong dispute as to whether Aeroquip has failed to perform all of its obliga-

tions under the license agreement by wilfully manufacturing and selling goods covered by the patent and failing to account for or pay royalties on them. *Cf.* Brumby Metals, Inc. v. Bargen, 275 F.2d 46, 50 (7th Cir. 1960). In this unsettled state of the record, defendant is not entitled to the extraordinary remedy of an injunction against plaintiff.

Accordingly, defendant's motion for a preliminary injunction will be denied.

*Motion for Partial Summary Judgment as to Royalties*

■ Plaintiff Crane Co. has moved for partial summary judgment as to royalties, accrued under the license agreement prior to the filing of the complaint in Civil Action No. 72 C 1403, on 5700 Series couplings and "modified" 5700 Series couplings marked with plaintiff's Patent No. 2,933,333. In support of its motion, plaintiff argues that having marked the couplings and "modified" couplings with the patent number, defendant is estopped from asserting that any of the 5700 Series couplings are not within the scope of the patent. Defendant asserts that summary judgment is improper because the *Lear* case obviates the requirement of the licensee paying royalties pending a determination of the validity of the patent.

In the opinion of this court, it would be reading *Lear* far too narrowly to suggest that the licensee will remain liable for royalties, as a matter of law, until it is sued for infringement or breach of the license agreement and raises the patent invalidity defense. If *Lear* is interpreted to mean that licensees are relieved from liabilities for royalties *only* "during the time they are challenging patent validity in the courts" (395 U.S. at 673, 89 S.Ct. at 1912), then the patentee could simply wait until the patent expires and sue for all royalties not paid "prior" to the litigation. Accordingly, the burden would be shifted to the licensee to bring a suit for a declaratory judgment that the patent is invalid.

That is clearly not what the *Lear* case contemplates.[6]

> "*Lear* permits an accused infringer to accept a license, pay royalties for a time, and cease paying when financially able to litigate validity, secure in the knowledge that invalidity may be urged when the patentee-licensor sues for unpaid royalties." Blonder-Tongue v. University Foundation, *supra*, 402 U.S. at 346, 91 S.Ct. at 1451.

This court cannot discern any difference, in practical economic reality, between the licensee who pays royalties for a time, then stops, but continues to sell the "patented" product while challenging the validity of the patent and the licensee who, like Aeroquip, has refused to pay royalties on a "modified" coupling marked with the patent number and not only challenges the validity of the patent, but also raises the defense of non-infringement. The effect of selling a so-called or marked "patented" product during the pendency of litigation has the same economic effect on the public whether or not the seller-licensee raises the patent validity defense alone or in conjunction with the defense of non-infringement. Hence, the fact that Aeroquip has raised the defense of non-infringement is, at this stage of the proceeding, irrelevant. The validity of the patent must be determined before there can be liability for unpaid royalties on goods sold by the licensee under the patent license, even though the goods are clearly within the scope of the patent and marked with the patent number. There is no rational reason why the rule should be any different for goods arguably outside the coverage of the patent,

but marked with the patent number. Finally, there is no suggestion in *Lear*, or any cases that have come to the attention of this court, that a prerequisite, under *Lear*, for avoidance of royalties while waiting to be sued for infringement is that the licensee *must* refrain from marking any of its products with the patent number.

 A separate question may arise later in the event the patent is held valid but not applicable to the "modified" couplings. Nothing that has been said in this opinion would interfere with the application of the general rule that marking with a patent number will estop the marker from denying that the marked product is within the scope of the patent. See, *e. g.*, Gridiron Steel Co. v. Jones & Laughlin Steel Corp., 361 F. 2d 791, 797 (6th Cir. 1966).

Accordingly, the motion for summary judgment as to royalties will be denied.

*Motion to Compel Answers to Interrogatories*

 Plaintiff Crane has moved to compel defendant to answer interrogatories 30 and 31 relating to the sale by defendant of both couplings explicitly covered by the license agreement and the so-called "modified" couplings.

In view of the fact that this is a contract as well as an infringement action and that commercial success will be an issue (Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ), defendant is ordered to answer interrogatories numbered 30 and 31. Technograph, Inc. v. Texas Instruments, Inc., 43 F.R.D. 416, 418 (S.D.N.Y.1967);

---

6. Troxel Mfg. Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6th Cir. 1972), heavily relied on by plaintiff, merely holds that a licensor is not liable to repay royalties accepted in good faith prior to an adjudication of patent invalidity. The court reaffirmed the rule of Drackett Chemical Co. v. Chamberlain Co., 63 F.2d 853 (6th Cir. 1933), that royalties paid need not be refunded after an adjudication of patent invalidity and that a decree of in-

validity obviates any further obligation of a licensee to pay royalties, notwithstanding the licensee estoppel doctrine. It is important to note that the court in *Troxel* stated that:

> "A licensee may at any time cease royalty payments, secure in the knowledge that the invalidity of the patent may be urged when the licensor sues for unpaid royalties." 465 F.2d at 1260.

Burndy Corp. v. United States Components, Inc., 208 F.Supp. 707 (S.D.N.Y. 1962).

An order has been entered today incorporating the above rulings.