ATLAS CHEMICAL INDUSTRIES,
INC., Plaintiff-Appellant,
Cross-Appellee,

v.

MORAINE PRODUCTS,
Defendant-Appellee,
Cross-Appellant.

Nos. 74–1141, 74–1142.

United States Court of Appeals,
Sixth Circuit.

Dec. 12, 1974.

Gilbert Gove, Miller, Canfield, Paddock & Stone, Detroit, Mich., Arthur G. Connolly, William J. Wier, Jr., Connolly,

Bove & Lodge, James M. Mulligan, Jr., Wilmington, Del., for plaintiff-appellant.

Richard D. Grauer, Bernard Cantor, Cullen, Settle, Sloman & Cantor, Detroit, Mich., Alvin D. Shulman, Allen H. Gerstein, Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for defendant-appellee.

Before PHILLIPS, Chief Judge, ENGEL, Circuit Judge, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This is an appeal from summary judgment in a patent suit filed by a licensee (Atlas) against the licensor (Moraine), in which the District Court declared the licensor's patent No. 3,422,189 to be invalid. The District Court ordered that royalties which had been escrowed during the period in which the action was pending be paid over to the licensor, and assessed certain pre-litigation costs against the licensee. Reference is made to the decision of the District Court, reported at 350 F.Supp. 353 (E.D.Mich.1972) for a discussion of the complex details of the prosecution of the patent application before the Patent Office, and for the details of the series of license agreements which were negotiated both before and after the issuance of the patent. We affirm the finding of invalidity, and reverse as to the escrowed royalties and pre-litigation costs.

This suit began as an action by Atlas Chemical Industries, Inc. (Atlas), a licensee, to declare invalid a patent held by its licensor, Moraine Products (Moraine). The action was initiated on authority of Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). The invention described in the licensed patent concerns the use in humans of a drug formula comprising a mixture of organo-polysiloxane and finely divided silica, marketed by Dow Corning Corporation as Antifoam A. This composition, also known commercially as "simethicone," originally was used to treat cattle bloat. Dr. Joseph H. Rider, the patentee who assigned his patent to Moraine, discovered that this composition also could be

used to alleviate flatulence or gas in the gastrointestinal tract of humans.

When Atlas originally sued to invalidate the patent it offered in its complaint to pay royalties into escrow during the pendency of the suit. The District Court so ordered. A total of $291,808 in royalties was paid in escrow.

Following extensive discovery by both parties, Atlas moved for summary judgment of invalidity on the basis that there was no genuine issue of material fact and that the patent was invalid because of a prior use. 35 U.S.C. § 102(b). Moraine filed a cross motion for dismissal of the complaint on account of the alleged "unclean hands" of Atlas. Moraine claimed that Atlas had known of the prior use which invalidated the patent, and had withheld that information from Moraine and from the Patent Office during the pendency of the patent application.

The District Court found that there was no material dispute of fact as to the prior use and granted summary judgment in favor of Atlas on the issue of validity. Moraine's cross motion was denied on the theory that the public interest precluded a dismissal, since to hold otherwise would be to validate an invalid patent by estoppel or misconduct. 350 F.Supp. at 356.

The District Court was convinced that the "unclean hands" defense raised by Moraine had its application in other areas. It was held that, even though no counterclaim had been filed, "[c]ertainly Moraine should be made as whole as possible. Atlas should be required to pay damages to Moraine." *Id.* at 359. Certain costs and expenses which were incurred in procuring and defending the patent were assessed against Atlas in the sum of $139,495.40. The escrowed royalty payments, totaling $291,808, were also ordered paid over to Moraine.

## I.

The first issue concerns the disposition of the case by summary judgment. We recently have treated summary judgment in patent cases in detail and have stated that this procedure "may be a useful tool in cases where the validity of a patent is involved" but that it "should be used sparingly." Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193, 1195–1196 (6th Cir. 1974).

In *Tee-Pak* we made the following comment concerning the statutory presumption of validity:

"An additional consideration that is present in patent cases is the statutory presumption of validity. A patent is presumed valid and the burden of proving its invalidity rests squarely on the party challenging it. 35 U.S.C. § 282. Even though this presumption may be weakened by the failure of the Patent Office to consider all pertinent art, the degree by which it is weakened depends on a balancing of the pertinence of the newly cited art with the pertinence of the art considered by the Patent Office. Thus, unless the presumption has been destroyed, it is a relevant factor for the court to consider in ruling on a motion for summary judgment." 491 F.2d at 1196.

■ Since the ground of invalidity asserted in the present case does not touch on any area of inquiry considered previously by the Patent Office, there are no balancing factors here which weigh in favor of the presumption in disposing of the motion for summary judgment.

■ After reviewing the record in the present case, even with the abundance of caution which is required in relation to summary judgment, we agree with the District Court that there is "no genuine issue as to any material fact," Rule 56, Fed.R.Civ.P., and that the patent is invalid for prior public use.

■ Under 35 U.S.C. § 102(b) a patent is invalid if "the invention was . . . in public use . . . more than one year prior to the date of the application for patent in the United States." "Public use" is defined as "any non-secret use of a completed and operative invention in its natural and intended way." FMC Corp. v. F. E. Myers & Bro. Co., 384 F.2d 4, 9 (6th Cir. 1967), cert. denied, 390 U.S.

988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *see* Dunlop Co., Ltd. v. Kelsey-Hayes Co., 484 F.2d 407 (6th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); Minnesota Mining & Mfg. Co. v. Kent Indus., Inc., 409 F.2d 99, 100 (6th Cir. 1969).

The evidence in this case shows that the patent to the composition *per se* had been held by Dow Corning Corporation, but that its utility had been limited essentially to the treatment of cattle bloat. Dow Corning marketed this material under the name Antifoam A to Dr. Rider, one of the founders of Moraine and the patentee of the use of Antifoam A in humans. Prior to the time that Dr. Rider filed his application, and unknown to Dr. Rider, this same material was being sold to Leonard Bergstein, a pharmacist of Midland, Michigan. Since Dr. Rider's application was filed on January 2, 1959, patent invalidity could be proved by a public use prior to January 2, 1958. Our examination of the record convinces us that the District Court was correct in concluding that:

> "The record is without dispute that during the summer and fall of 1957 a druggist named Bergstein in Midland, Michigan, marketed Antifoam A prepared by the Dow Corning Corporation as a method of treating intestinal gas in humans. It indicates without dispute that prescriptions for this product were filled, sold and the product was used by patients in Midland prior to January 2, 1958." 350 F.Supp. at 355.

Moraine contends that Bergstein's use of the product was experimental and, therefore, did not constitute a prior public use. *See* New Jersey Wood Paving Co. v. American Nicholson Pavement Co. (reported as Elizabeth v. Pavement Co.), 97 U.S. 126, 24 L.Ed. 1000 (1877).

In Dunlop Co. v. Kelsey-Hayes Co., *supra*, 484 F.2d at 413–414, this court held that in the face of a "prima facie demonstration of prior use, the inventor then has the burden of proving that this use 'was not of a functionally operative device, or was substantially used for experimental or testing purposes.' "

■ This exception is to be guarded closely. "[T]he use of a single specimen, even in a factory and in the presence of a few employees, may be public." A. Schrader's Sons, Inc. v. Wein Sales Corp., 9 F.2d 306, 308 (2d Cir. 1925) (L. Hand, J.); *see* Consolidated Fruit Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 98 (1876). Likewise, a single instance of placing the invention on sale is sufficient to invalidate the patent. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 258, 8 S.Ct. 122, 31 L.Ed.2d 141 (1887); Minnesota Mining & Mfg. Co. v. Kent Indus., Inc., *supra,* 409 F.2d at 100.

The District Court found that "[t]he product was prescribed by physicians, sold by Bergstein and used by patients to treat physical disorders," and that "[t]he record . . . is clear beyond any doubt that Bergstein's use was not experimental." This finding is supported fully by the record.[1]

Since the record demonstrates that there was prior public use, and that the use was not privileged or "experimental," we agree with the conclusion of the District Court that the patent is invalid under 35 U.S.C. § 102(b).

## II.

Although the District Judge correctly decided the issue of the invalidity of the patent, he erred in directing that the accumulated royalties held in escrow be paid over to the licensor, Moraine. This arises from a misinterpretation of the decisions of this court in Troxel Manufacturing Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (1972) (hereinafter referred to as Troxel I) and Troxel Manufacturing Co. v. Schwinn Bicycle Co., 489 F.2d 968 (1973), cert. denied, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974) (hereinafter

---

1. It, therefore, is unnecessary to decide if experimental use by a person other than the inventor or someone within the inventor's control, is an exception to the bar against prior use. *Compare* Dunlop Co., Ltd. v. Kelsey-Hayes Co., 484 F.2d at 413–414 *with* Magnetics, Inc. v. Arnold Engineering Co., 438 F.2d 72, 74 (7th Cir. 1971).

referred to as Troxel II). The basic error of the District Court is reflected in this statement: *"Troxel* permits the licensor to keep the royalties when they have been paid during the course of litigation." 350 F.Supp. at 359.

*Troxel* did *not* involve an action by a licensee attacking the validity of a patent owned by the licensor. It was *not* the type of suit authorized by Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

The present suit *is* an action by a licensee, Atlas, attacking the validity of a patent owned by the licensor, Moraine. The instant case *is* the type of suit authorized by Lear v. Adkins.

In *Lear* the Court adopted an earlier dissenting view of Mr. Justice Frankfurter that the doctrine of licensee estoppel should be given "a decent public burial." 395 U.S. at 667, 89 S.Ct. 1902. (Citation omitted.) The right of Atlas to bring this action as licensee to litigate the validity of the patent therefore is unquestioned. In *Lear*, as in the present case, the issue of the obligation to pay royalties also arose. In *Lear* there is an even stronger case for the continued payment of royalties to the licensor since an express contractual provision in the license agreement required that royalties must be paid up until the time the "patent . . . is held invalid." *Id.* at 673, 89 S.Ct. 1902. As in the present case, in *Lear* the licensee also derived some benefit from the pre-issue disclosure. The Court stated:

"[I]t may be suggested that although Lear must be allowed to raise the question of patent validity in the present lawsuit, it must also be required to comply with its contract and continue to pay royalties until its claim is finally vindicated in the courts." *Id.* at 673, 89 S.Ct. at 1912.

The Court then focused on

"[t]he decisive question [of] whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties during the time they are challenging patent validity in the courts." *Id.*

The Supreme Court then concluded that "such a requirement would be inconsistent with the aims of federal patent policy." *Id.* After an exhaustive discussion of these policy reasons, *see id.* at 673–674, 89 S.Ct. 1902, the Court expressly held "that Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove invalidity." *Id.* at 674, 89 S.Ct. at 1913.

Our prior decisions are in harmony with these principles. In *Troxel I* we stated that a "licensee may at any time cease royalty payments, secure in the knowledge that the invalidity of the patent may be urged when the licensor sues for unpaid royalties." 465 F.2d at 1260. This court, speaking through Judge Kent, further interpreted the holding in *Lear* to mean:

"that a licensee should not be required to pay royalties while challenging the validity of the patent [and] concluded that requiring such payment would undermine the federal policy favoring full and free use of ideas in the public domain." Kewanee Oil Co. v. Bicron Corp., 478 F.2d 1074, 1085 (6th Cir. 1973), rev'd on other grounds, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed. 315 (1974).

It is urged that the foregoing analysis conflicts with our decisions in the two *Troxel* cases. To the contrary, those cases have an independent basis, recognized by *Lear,* and implement some of the underlying policies which require our decision in the present case. In the *Troxel* cases the licensee was doing nothing to contest the validity of the patent. The licensee continued to enjoy the fruits of the license. Only because of Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), did the licensee become an incidental beneficiary to the invalidity established in the litigation initiated and prosecuted by another party in another circuit. *Lear* explicitly recognized the law of this Circuit that "[i]t is generally the rule

that licensees may avoid further royalty payments, regardless of the provisions of their contract, once a third party proves that the patent is invalid. *See, e. g., Drackett Chemical Co. v. Chamberlain Co.*, 63 F.2d 853 (1933)," 395 U.S. at 667, 89 S.Ct. at 1909.

In *Troxel I* we stated that "the rationale of *Drackett* remains the law of this Circuit except insofar as it expresses the licensee estoppel doctrine." 465 F.2d at 1259. It is apparent that *Drackett's* facts limit its application to the instances where the invalidity of the patent is challenged and proved by a third party. Further, we made it clear in *Troxel I* that there were differences in the equities of the situation if either the licensee himself was attacking the validity, or the licensee was seeking the refund of royalties *actually paid* to the licensor. One of the primary goals in *Lear* was to "unmuzzle" licensees so that an early adjudication of invalidity could inure to the public interest. We rejected the contention that the licensee should recover the total royalties paid prior to the adjudication of invalidity of the patent because this would give the licensee the legal equivalent of a "heads-I-win, tails-you-lose" advantage in a license agreement. Expeditious evaluation of the patent would be defeated:

> "If the licensee could recover royalties paid (subject to any statute of limitations) on the basis of an adjudication of invalidity accomplished by another litigant, without incurring the expense or trouble of litigation, there would be less inducement for him to challenge the patent and thus remove an invalid patent from the competitive scene. He would be more likely to wait for somebody else to battle the issue because he would have nothing to lose by the delay.

> "Rather than stimulating early litigation to test patent validity, such an interpretation of *Lear* would make it advantageous for a licensee to postpone litigation, enjoy the fruits of his licensing agreement, and sue for re-

payment of royalties near the end of the term of the patent. When a licensed patent is about to expire and the threat of injunction no longer exists, a licensee would have little to lose in bringing an action to recover all the money he has paid in royalties on the ground of the invalidity of the patent. The licensee would have a chance to regain all the royalties paid while never having been subjected to the risk of an injunction. Such an interpretation of *Lear* would defeat one of the expressed purposes of the court in announcing that decision." 465 F.2d at 1257.

It is apparent that these equitable considerations commend an opposite result in the present case. The freedom from royalty payments, at as early a date as possible, is a strong "inducement . . . to challenge the patent and thus remove an invalid patent from the competitive scene." *Id.* Moreover, the licensee would not be "likely to wait for somebody else to battle the issue," *id.*, if he were to lose his royalties while sitting on his rights in the hope for a valiant third party to pull the chestnuts out of the fire. The cases in the other Circuits which have reached this issue are in agreement with our interpretation. The Second Circuit has stated:

> "What *Lear* precisely held was that the courts may not enforce a royalty agreement with respect to an invention embodied in an American patent while the licensee was contesting its validity and could recover only when, as and if validity was established." *Painton & Co., Ltd. v. Bourns, Inc.*, 442 F.2d 216, 226 (1971).

The Supreme Court has quoted with approval the statement in *Painton, id.*, that if an invalid patent issues: "many will prefer to pay a modest royalty than to contest it, even though *Lear allows them to accept a license and pursue the contest without paying royalties while the fight goes on.*" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 488, 94 S.Ct. 1879, 1889 (1974). (Emphasis added.)[2]

---

2. *See* also Congoleum Indus., Inc. v. Armstrong Cork Co., 366 F.Supp. 220, 233 (E.D.

Pa.1973); Horwitt v. Movado Watch Agency, Inc., 364 F.Supp. 687, 689 (S.D.N.Y.1973); *see*

■ The payment of royalties in escrow does not change the result in this case. While an escrow is a commendable procedure to preserve the status quo during the course of litigation, the funds belong to neither party until the validity of the patent is determined.

The termination of the obligation to pay royalties in the *Troxel* cases is in part tied to the fact that "Troxel did not cease royalty payments prior to the Ninth Circuit's holding of invalidity," *Troxel II*, 489 F.2d at 973. The claim that a licensor could be compelled "*to repay all royalties* received from its licensees,*" Troxel I*, 465 F.2d at 1259 (emphasis added), was soundly rejected.[3]

■. We reverse that part of the judgment of the District Court ordering payment to Moraine of escrowed royalties.

### III.

The District Court awarded Moraine $139,495.40 in summary judgment for costs and expenses incurred in prosecuting the patent, and "in defending the patent against alleged infringers." 350 F.Supp. at 359. Costs and attorneys fees involved in the present action were not included. The theory on which this award was made was that Atlas had been guilty of unconscionable conduct when it did not disclose what it knew of the prior use during the prosecution of the patent.

■ It is unnecessary for us to inquire as to either the substance of these allegations, or whether if correct they could form the basis for relief. The award must fail because this issue was not properly before the court by appropriate pleadings.

■ Rule 56, Fed.R.Civ.P., permits summary judgment for a "party seeking

to recover upon a claim, counterclaim, or cross-claim." A defending party may also move for summary judgment, but only as to a claim, counterclaim or cross-claim that has been asserted against him. Rule 56(b). In order to receive affirmative relief the party must become a claimant and assert the proper pleading. Rule 12(b) relaxes the formal requirements of pleading and allows certain defenses to be made by motions at the option of the pleader. However, none of these exceptions, nor those embodied in other rules, encompass affirmative relief of the type awarded in the present action. In the present case Moraine did not file a counterclaim, *see* Fed.R.Civ.P. 13. Atlas, therefore, was deprived of notice as to the nature of the claim or the relief that might be due. Fed.R.Civ.P. 8.

Professor Moore states the fundamental rule as follows:

"[T]he function of pleadings under the Federal Rules is to give *fair notice* of the claim asserted so as to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought, . . . so that it may be assigned to the proper form of trial. 2A Moore's Federal Practice ¶ 8.13 at 1695. (Footnote omitted.)

It is elementary that proper pleadings are a prerequisite to recovery. New & Used Auto Sales, Inc. v. Hansen, 245 F.2d 951 (9th Cir. 1957); *See* Armstrong Cork Co. v. Lyons, 366 F.2d 206 (8th Cir. 1966).

Since these damages were never pleaded they cannot be recovered.

Moraine relies upon the decision of this court announced by Judge McAllister, in Jack Mann Chevrolet Co. v. Asso-

*generally* Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc., 489 F.2d 974, 976–977 (7th Cir. 1973); *but see* Kraly v. National Distillers and Chem. Corp., 502 F.2d 1366 (7th Cir. 1974).

3. *Troxel I* and *Troxel II* announce and apply precisely the same rule with respect to the cut off date for liability for royalties where the licensee did not sue to challenge the valid-

ity but continued to pay royalties until invalidity was declared in other litigation challenging the validity of the patent. In that situation liability of the licensee for royalties ceases on the date of eviction of the patent, that is, the date as of which the patent is determined to be invalid. This is the holding in both cases. *Troxel I*, 465 F.2d at 1259–1260; *Troxel II*, 489 F.2d at 973.

**8**

ciates Inv. Co., 125 F.2d 778 (6th Cir. 1942). In the absence of adequate pleadings we cannot reach this issue.

We reverse that part of the judgment of the District Court which awards $139,495.40 to Moraine for costs and expenses.

### IV.

 Atlas contended that the Moraine patent was procured fraudulently, and that Moraine, therefore, was liable for attorneys fees, 35 U.S.C. § 285, see Deyerle v. Wright Mfg. Co., 496 F.2d 45 (6th Cir. 1974), or a refund of paid-in royalties, see Troxel I, 465 F.2d at 1259 n. 5. Although a patent applicant is held to "the highest degree of candor and good faith," Kingsland v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed.2d 123 (1949), when dealing with the Patent Office, we are in agreement with the action of the District Court in ruling against Atlas on this issue.

The judgment of the District Court is affirmed as to the invalidity of the patent and reversed on the issues of the escrowed royalties and the pre-litigation costs and expenses.

Costs are taxed against Moraine Products.