**CRANE CO., Plaintiff,**

v.

**AEROQUIP CORPORATION, Defendant.**

Nos. 72 C 1403, 72 C 2755.

United States District Court,
N. D. Illinois, E. D.

Sept. 18, 1973.

Henry L. Brinks, James B. Blanchard and Melvin F. Jager, Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Chicago, Ill., and Norman Pacun and Geo. S. Schwind, New York City, c/o Crane Co., for plaintiff.

William A. VanSanten, Hofgren, Wegner, Allen, Stellman & McCord, Chicago, Ill., Don K. Harness and Robert L. Boynton, Harness, Dickey & Pierce, Detroit, Mich., and Jerry K. Harness, Jackson, Mich., c/o Aeroquip Corp., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

These consolidated breach of contract and patent infringement actions arose out of a dispute between the owner of United States Letters Patent No. 2,-933,333 ("the suit patent"), plaintiff, Crane Co., and the exclusive licensee under said patent, defendant, Aeroquip Corporation. Most of the relevant back-

ground facts are set forth in this court's memorandum opinion of March 13, 1973, which is reported in 356 F.Supp. 733, D.C. At that time plaintiff's motion for partial summary judgment as to royalties and termination of the license agreement and defendant's motion for a preliminary injunction enforcing the license agreement pending consideration of the issues of patent validity and infringement were denied.

The cases have now been tried before the court, and this memorandum opinion will stand as this court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

As this court stated in the March 13th opinion, "the overall importance of the patent validity and infringement issues to the ultimate resolution of the license-validity issue" necessitate consideration of those issues first. Hence, as it is axiomatic that validity must be established before there can be infringement, Walker's Deller on Patents § 588, Vol. 7, p. 425, the issue of validity will be considered first.

## I. Validity

### A. The Effect of the Consent Decree

In 1967, Crane brought a patent infringement action against Aeroquip in this Court (Civil Action 67C 988), alleging that Aeroquip's 5700 Series Coupling[1] infringed the Bredtschneider, et al., patent (the present suit patent). In settlement of the foregoing civil action, plaintiff and defendant negotiated an exclusive license agreement, by the terms of which Aeroquip became the exclusive licensee under the Bredtschneider patent. The license agreement became effective June 1, 1968, and in connection therewith, a consent judgment was entered on June 12, 1968.

The judgment ordered entered by Judge Marovitz states, inter alia:

"2. That United States Letters Patent No. 2,933,333, was duly and legally issued and is good and valid in law as between the parties to this action.

. . . . . . .

"4. That no other relief is granted hereby, the parties representing to the Court that all other matters of relief requested in the pleadings having been settled by agreement of the parties."

Plaintiff argues that the aforesaid prior judgment decree of validity should be given full *res judicata* effect and govern the issue of validity in this case. Defendant contends that a consent judgment of validity does not prevent a licensee from subsequently contesting validity.

While the question might otherwise be a difficult one, it has already been decided in this Circuit and merits only brief discussion. It is now clear that a consent decree of validity will not bar subsequent assertions of invalidity by a party to the decree, Business Forms Finishing Service, Inc. v. Carson, 452 F.2d 70 (7th Cir. 1971); Butterfield v. Oculus Contact Lens Company, 332 F.Supp. 750, 760 (N.D.Ill.1971), especially where, as here, there was no finding of infringement.[2] Business Forms Finishing Service, Inc. v. Carson, *supra*, 452 F.2d at 75. See also, Broadview Chemical Corporation v. Loctite Corporation, 474 F.2d 1391, 1395 (2d Cir. 1973); Addressograph-Multigraph Corp. v. Cooper, 156 F.2d 483, 485 (2d Cir. 1946). *Cf.* Schnitger v. Canoga Elec. Corp., 462 F.2d 628 (9th Cir. 1972). The foregoing decisions are founded on the policy that the undesirability of having the public pay royalties to one who does not have a valid patent

1. Which was the subject of defendant's Abbey patent application in 1961.

2. Whether there will be an estoppel even if infringement is adjudicated is still open to question in this Circuit. See, Maxon Premix Burner Co., Inc. v. Eclipse Fuel Eng. Co., 471 F.2d 308, 311–312 (7th Cir.), cert. denied, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973).

outweighs the desirability of encouraging settlement of lawsuits. Butterfield v. Oculus Contact Lens Company, *supra,* 332 F.Supp., at 760. Furthermore, the public policy importance of having patents actually adjudicated before foreclosing the issue of validity requires the result reached here. The cases relied upon by plaintiff are inapposite.[3] Those cases involved criminal contempt proceedings wherein the defendant wilfully and knowingly violated a court order by selling an infringing product. Hence, the 1968 consent decree does not foreclose consideration of the merits of the validity question here.

### B. The Suit Patent

The Bredtschneider, et al. Patent No. 2,933,333 "relates to a coupling for parts of a closed pressure fluid system, and more particularly to such a coupling for connection of such parts containing fluid under pressure and closed at the portions to be secured together." According to one of the inventors (Drewes), the couplings of the suit patent were conceived as a response to problems which had developed in connection with the field installation and repair of split system air conditioning. The need had developed for a connecting means which would reduce contamination and leakage, allow the system to be fully pre-charged at the factory and would be inexpensive and easy to install. The suit patent is allegedly the response to the problem, although plaintiff never actually made physical models of or manufactured any of the couplings shown in the suit patent.

In practice, at least one structure disclosed by the suit patent has been used for permanently connecting split-type air conditioning systems commonly employed for residential central air conditioning systems (Aeroquip 5700 Series

coupling). The alleged invention employs a means whereby an unskilled installer, with the use of two wrenches, can couple the pipes leading to the condensor (which is generally placed outside the building) and the cooling coil (which is generally located inside the building) by simply turning a union nut which moves the coupling parts together. Because the pipes are most conveniently pre-charged with refrigerant fluid at the factory, the need for the difficult and costly practice of purging the system of air and contaminants at the installation site was sought to be avoided by developing a "quick-connect", "one-shot" coupling of hermetically sealed conduits. This is claimed to be accomplished by the suit patent with a means for temporarily sealing the connection as the diaphragms at the ends of the connecting pipes are disrupted by a cutter and permanently sealing the connection when the coupling is complete.

Plaintiff claims that the suit patent, as embodied in Aeroquip's 5700 Series coupling and the accused "parent metal seal" 5700 Series coupling, satisfies the aforesaid industry needs by a method properly qualified for patent protection.

There are nine claims presently in issue;[4] Claims 1–4, 6, 9, 11, 14 and 15. Claim 1–4 emphasize the temporary and final seal aspect of the coupling means. Claim 1 is illustrative and reads as follows:

"A coupling for a closed fluid system, comprising[5]

(1) a pair of coupling parts movable relatively toward each other each having a passage therethrough,

(2) means for moving said parts toward each other in passage-aligning relation,

(3) a relatively thin metallic diaphragm in each part closing the passage therein,

3. Dow Chemical Company v. Chemical Cleaning, Inc., 434 F.2d 1212 (5th Cir.) cert. denied, 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed. 2d 113 (1971); Shell Oil v. Barco, 430 F. 2d 998 (8th Cir. 1970).

4. Claim 5 was withdrawn at the conclusion of plaintiff's case.

5. The number designations have been included for purposes of analysis only.

(4) passaged cutting means disposed interiorly of the parts disrupting said diaphragms upon movement of the parts toward each other to open the passages to each other and defining a portion of the passage through the coupled parts,

(5) means sealing against leakage during movement of the parts to final position after diaphragm disruption, and

(6) gasket means sealing between the parts in final position thereof."

Claims 6, 9, 11, 14 and 15 emphasize the relationship between the diaphragms which close the passages in the coupling parts before they are assembled together and the cutter or piercing means which pierces the diaphragms when the two coupling parts are connected together. Claim 9 is illustrative and reads as follows:

"A coupling for a closed fluid-circulating system, comprising [6]

(1) a pair of passaged coupling parts relatively movable toward each other,

(2) means for moving said parts relatively toward each other in passage aligning relation,

(3) means in each part closing the passage therein,

(4) said closing means engaging against each other upon said movement of the parts and the closing means of one of the parts having separable securement therein for detachment and movement by the other closing means, and

(5) piercing means secured in said one part adjacent and inwardly of the closing means thereof engaging and penetrating said engaged closing means upon said movement thereof to open the passages to each other,

(6) said piercing means including means bearing against and displacing the penetrated closing means toward

the wall of the passages to prevent flow obstruction thereby." [7]

## C. Novelty

Defendant Aeroquip asserts that Claims 1–4 of the suit patent are invalid as "anticipated" by the invention disclosed in Morrison prior art United States Letters Patent No. 2,507,370 ("Morrison"). Plaintiff argues that Morrison does not function in the same way or achieve the same results as the invention of the suit patent and, therefore, does not "anticipate" it. In determining the question of anticipation, it is necessary to first examine the invention disclosed in Morrison and then consider the scope of the suit patent and its differences from Morrison.

The Morrison patent relates to an invention for a "demountable cold box" to be used for refrigeration purposes. Pertinent to this lawsuit is the disclosure in Morrison of "An alternative mode of connecting the duct systems of adjacent [cold] plates . . . when the storage refrigerator is intended to remain permanently assembled." Essentially, the Morrison patent describes a means for connecting "any suitable duct through which fluid refrigerant is to flow." Both the refrigerant carrying duct and the "outside connecting member or tube" are "closed by a sealing cap". The closed ends are moved together by means of threads at the ends of the connecting members and an octagonal union nut, which, when turned, draws the ends together. Before the ends are moved together, the Morrison patent calls for the interposition of an assembly consisting of "a body in the form of a disc with a conic portion at one side and an outwardly off-set portion at the other." [8] The aforesaid body, which must be separately "slipped into position" "defines a central passage aligned with the ducts", which passage

---

6. Number designations have been included for purposes of analysis only. See note 5, *supra*.

7. The above portion of Claim 9 is omitted from Claim 6.

8. Number references to the patent's illustrated figures are omitted.

is "partly closed by a disc having a plurality of apertures and also supporting a rupturing member having opposite conic heads." The rupturing member is a solid rod. As the connecting ducts are moved together, the rupturing member pierces the sealing caps putting the ducts in communication and allowing the refrigerant to flow. The contact of the flared surface of the connecting member with the conic portion of the interposed disc, when the union nut is tightened, was intended to form an "effective sealing contact." No other sealing means is indicated.

Plaintiff's expert testified, and the exhibits clearly show, that the first three elements of Claim 1 are fully met by Morrison. Plaintiff vigorously disputes, however, that Morrison comprises: (1) a passaged cutting means disposed *interiorly* of the parts; (2) a dynamic sealing means against leakage during movement; or (3) a gasket means forming a static seal when the coupling is complete. Hence, Crane asserts that Morrison does not "anticipate" the suit patent.

First, defendant contends that Claims 1–4 are "generic" claims and, as such, cover and read on the construction of Figs. 4–6 of the suit patent. Figs. 4–6 clearly depict a passaged cutter with cutting edges at each end inserted *between* the diaphragms enclosing the coupling parts. On that basis, defendant argues that the claim "interiorly of the parts" reads on Morrison.[9] Second, defendant argues that Morrison discloses a "passaged" cutting means in that the cutting member of Morrison comprises a multi-apertured disc, and, finally, that the sealing and gasket means of the suit patent are either present in Morrison or an obvious adjunct of it.

It is axiomatic that an invention is not patentable if it lacks novelty. 35 U.S.C. § 102.[10]

Statutory novelty requires that an invention be, in fact, something "new". Graham v. John Deere Co., 383 U.S. 1, 12–14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Essentially, the court must determine whether there is "disclosure in the prior art of a thing substantially identical with the claimed invention." Malsbary Manufacturing Co. v. Ald, Inc., 310 F.Supp. 1112, 1115–1116 (N.D. Ill.1970); 1 Walker's Deller on Patents, § 57, at 237 (2d ed. 1964). "Substantial identity" exists if two inventions "perform substantially the same function or office in substantially the same way, and produce substantially the same result." Delta Mfg. Co. v. E. L. Essley Mach. Co., 153 F.2d 905, 906–907 (7th Cir.), cert. denied, 328 U.S. 867, 66 S.Ct. 1376, 90 L.Ed. 1637 (1946). It is important to note, however, that incorporation of a "strict identity" test into § 102(b), in light of the "non-obviousness test" of § 103, has been clearly rejected by recent decisions of this Circuit. Shelco, Inc. v. Dow Chemical Company, 466 F.2d 613 (7th Cir.), cert. denied 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972); Frantz Manufacturing Co. v. Phenix Manufacturing Co., 457 F.2d 314 (7th Cir. 1972). Accordingly, if the differences between the prior art invention and the patent in suit are not patentable and would have suggested themselves as obvious improvements to one of ordinary skill in the art, then the patent in suit is "anticipated" by the prior art invention. Of course, a patent is presumed to be valid, and the party asserting invalidity has the burden of proving anticipation by "clear and convincing evidence." 35 U.S.C. § 282; Illinois Tool Works, Inc. v. Continental Can Co., 273 F.Supp. 94, 106 (N.D.Ill.), aff'd., 397 F.2d 517 (7th Cir. 1968). This is particularly true where, as here, the principal prior art reference was considered by the Patent Office. Skil Corp. v. Cutler-Hammer,

---

9. Plaintiff asserts that Claims 1–4 are not generic and do not cover Figs 4–6. Mr. Magos, plaintiff's expert on the question of validity, testified the "interiorly of the parts" meant *"behind* its diaphragm and interior to the system it is sealing." (Emphasis added.) (Tr. 239)

10. 35 U.S.C. § 102(b) provides:

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . "

Inc., 412 F.2d 821 (7th Cir.), cert. dismissed, 396 U.S. 951, 90 S.Ct. 394, 24 L. Ed.2d 257 (1969).

There is considerable dispute in this case as to the scope of the suit patent and which features of the invention were "unique" in light of the prior art, and, specifically, the Morrison patent. In this regard, the file wrapper is particularly significant because the most pertinent prior art was thoroughly considered by the Patent Office and cited as references. (See note 13, *infra,* discussion *infra* re. obviousness.)

At this point it is only necessary to consider the file wrapper history of Claims 1–4, which were initially prosecuted as Claims 1, 2, 3 and 5 (hereinafter Claims 1–4). As originally filed, Claims 1–4 did not include elements 5 and 6 listed above. The Examiner rejected the claims as "fully met by Morrison". At the outset it should be noted, and this court so finds on the basis of the evidence contained in the file wrapper, that both the attorney for the applicants (Mr. Lange) *and* the Examiner considered Claims 1–4 to be *generic* claims, *i. e.*, the claims were intended to cover all species of the invention including the construction of Figs. 4–6. In his reply to the Examiner's initial rejection of Claims 1–6, Mr. Lange stated:

> "It is submitted that the rejection of the *generic* claims as met by Morrison is not justified by the reference." (Emphasis added.) (File Wrapper p. 23)

Again, in the same letter, he asserted:

> "In view of the apparent patentability of *generic* claims 1 to 3 and 5, it is submitted that the requirement for election of species should be with-

drawn and an action given on the merits of the other claims in the case." (File Wrapper p. 25) [11]

In a subsequent letter, the Examiner noted:

> "In the event that there are no claims finally held allowable to the species illustrated in Figures 4 to 6, applicants will be required to cancel Figures 4 to 6 and also the matter contained in the specification relative thereto." (File Wrapper p. 38)

It is significant that the claims directed specifically to Figures 4 to 6 were ultimately withdrawn after the Examiner suggested that all of the claims did not "depend from or otherwise include all of the limitations of an allowed *generic* claim as required by Rule 141." (Emphasis added.) However, Figures 4 to 6 remained in the application and, ultimately, the patent.

The foregoing discussion is relevant in light of plaintiff's assertion, through its expert, Mr. Magos, that "interiorly of the parts" in Claims 1–4 means *within* the pressure system and *behind* the diaphragm.[12] It is clear that the cutting means reflected in the construction of Figures 4–6 is not, at least in the uncoupled position, *within* the pressure system and *behind* the diaphragm. It is only "disposed interiorly of the parts" in the sense that as it performs its task it becomes interior to the coupling parts.

It should be noted that Mr. Lange failed to challenge the Examiner's assertion that the cutting means in Morrison is "disposed interiorly of the parts". See File Wrapper pp. 36, 39–45. Hence, it is clear that Claims 1–4 are *generic* and read on Figs. 4–6.

11. Rule 146 of the Rules of Practice in the United States Patent Office provides:

"Election of species. In the first action on an application containing a generic claim and claims restricted separately to each of more than one species embraced thereby, the examiner, if of the opinion after a complete search on the generic claims that no generic claim presented is allowable, shall require the applicant in his response to that action to elect that species of his invention to which his claims shall be restricted if no generic claim is finally held allowable . . . ."

12. In fact, Mr. Magos stated that one of the two "absolutely new" features of the suit patent design was its placing of the cutting "inside the pressure system". (Tr. 500)

On that basis, it is equally clear that the Examiner, who rejected the claims three times before finally allowing them, did not base his decision upon the placement of the cutter *within* one of the coupling parts and *behind* the diaphragm.

█ It is the opinion of this court, however, that the Examiner had independent bases for allowing Claims 1–4 over Morrison and the other prior art patents cited. In considering the Examiner's three initial rejections of the claims, it becomes apparent that he eventually determined that the combination of a passaged, non-flow obstructing cutter with a sealing and gasket means, operated to prevent fluid leakage and the ingress of air during the coupling operation.[13] Defendant has simply failed to show, by clear and convincing evidence, that the Examiner erred in his conclusion.[14] Based upon the level in the art one year prior to the application for the suit patent, the Examiner was convinced that the combination of a stationary cutting means with dynamic and static seals was a novel improvement over the Morrison patent not contemplated or suggested by other prior art, which included conduits enclosed by diaphragms (Markle and Curtis), tubular cutters (Pyrene Co.), a single seal (Bloom) and valves (Curtis). The expert testimony, which conflicted as to the novelty of the suit patent combination, is insufficient to overturn the Examiner's decision or rebut the presumption of validity. The expertise of the Patent Office is entitled to considerable weight. National Distillers & Chemical Corp. v. Brenner, 128 U.S.App.D.C. 386, 389 F.2d 927, 928 (1967). This is true notwithstanding plaintiff's assertion that Claims 1–4 are more limited than the file wrapper suggests. Accordingly, the court finds that the suit patent Claims 1–4 are not invalid under 35 U.S.C. § 102(b).

### D. Obviousness

█ Defendant challenges the validity of all the patent claims in suit on the basis that they were "obvious" in light of the prior art at the time of the invention and, therefore, invalid under 35 U.S.C. § 103.[15] In determining whether

---

13. A noted above, the claims in suit were initially rejected as fully met by Morrison. They were then amended to include the sealing and gasket means designated as elements 5 and 6. Mr. Lange argued that the claims were allowable because Morrison did not provide for a sufficiently "passaged" cutting means to avoid flow obstruction problems nor did it specifically describe the sealing mechanisms of the applicants' invention. The claims were again rejected on the basis of the combined disclosure of four patents: Markle (U.S.L.P. 1,933,117), Bloom (U.S.L.P. 2,759,743), Pyrene Co. (Great Britain 693,636) and Curtis (U.S.L.P. 2,667,760) (which is relied on by defendant here). The Examiner reasoned: "To provide both conduits with a thin diaphragm, as shown by Curtis, would not amount to invention and to provide sealing means between the coupled conduits would be an obvious mechanical expedient as shown by Bloom." After Mr. Lange answered by suggesting that Markle fails to show a means for moving the coupling parts together that the Pyrene cutter is non-stationary and would require a special mounting only taught by the patent; that Curtis is a valve in which piercing is not accomplished through movement of the parts, and that Bloom only provides for a *single* seal and *not* the combination seal of the applicants' invention. The Examiner then raised the same objection, citing Morrison in place of Markle and Curtis. Again Mr. Lange answered that Morrison does not contemplate or teach the use of a tubular cutter, that the O-ring of Bloom would function as a seal only after tightening and that, in any event, Morrison does not show or teach in specific terms a seal. As Mr. Lange stated:
 "As already indicated, neither of the references suggests or contemplates sealing to prevent leakage out of the device or ingress of air into it while the parts are being moved toward each other and before they come to their final position, and Morrison provides no seal even in that final position." (File Wrapper p. 41.)

14. Defendant asserts that "misrepresentations" as to the existence of a seal in Morrison and the inadequacies of the Morrison cutting means negated the "presumption of validity". I find the contention without merit in view of the fact that the Morrison patent was fully disclosed to and considered by the Examiner."

15. 35 U.S.C. § 103 provides:
 "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this

patent claims are invalid for obviousness, the court must consider (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the applicable art. *Graham v. John Deere Co., supra.*

The validity of Claims 1–4 has already been considered at some length. The finding that the differences between Morrison and the suit patent were not "obvious" in light of the prior art would have equal application here. *Frantz Manufacturing Co. v. Phenix Manufacturing Co., supra.* The prior art Morrison patent has been discussed at length and the prior art Curtis patent was considered and rejected by the Patent Office. See note 13, supra. As already stated, it is the opinion of this court that reconsideration of Morrison in light of Curtis and the other prior art cited by the Examiner did not establish that the Examiner's allowance of the claims was erroneous.

Claims 6, 9, 11, 14 and 15 relate to the species of Claims 1–4 embodied in Figs. 1–3 and Figs. 6–8. The sealing and gasket means are omitted from these claims, which stress the relationship between the diaphragms and the cutter. The claims disclose a means for coupling whereby, as the coupling parts are moved together, one diaphragm or closing means pushes the other, which is "separably secured" over the stationary cutter, which is disposed inwardly of and adjacent to the closing means in one of the parts. Since the diaphragms abut, air contaminants are eliminated. Morrison and Curtis, both considered and rejected by the Patent Office, do not teach the method disclosed in Claims 6, 9, 11, 14 and 15. The claims, rejected initially on the same grounds as Claims 1–4, and as being indefinite, were ultimately accepted for the same general reasons as Claims 1–4. There is no

clear and convincing basis for overturning the Examiner's conclusion in that regard.

However, defendant has cited some additional prior art not cited by the Patent Office. While the presumption of validity attending all patents will be weakened or rebutted if pertinent prior art was not considered by the Patent Office, *Rockwell v. Midland-Ross Corporation,* 438 F.2d 645, 650 (7th Cir. 1971); *Novo Industrial Corp. v. Standard Screw Co.,* 374 F.2d 824, 827 (7th Cir. 1967), citation of non-file wrapper references will not always affect the presumption of validity since they may have been dismissed as without sufficient pertinence to be cited. *Elgen Manufacturing Corp. v. Grant Wilson, Inc.,* 285 F.2d 476, 479 (7th Cir. 1961).

It is the opinion of this court that Morrison and Curtis, both cited and examined by the Patent Office, are the most pertinent prior art and that the non-file wrapper references cited by defendant accomplish little in rebutting the presumption of validity.

Morrison has already been described and its pertinence is undisputed. Curtis, U.S.L.P. 2,667,760, discloses a sealing means for subassemblies of refrigeration mechanisms whereby they may be shipped in a hermetically sealed condition, assembled easily, and then connected by rupturing the seals without opening the system. Essentially, the rupturing mechanism consists of an angle valve which, upon inward movement of the valve stem, pierces the seals and folds them toward the inner wall of the conduit. Expert testimony suggested that the valve construction of Curtis greatly restricts flow and reduces line pressure. Further, Curtis is not a "quick-connect" coupling whereby the connection is made by moving the parts together over a stationary cutter. Particularly with respect to Claims 6, 9, 11,

---

title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person

having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

14 and 15, Curtis does not suggest abutment of the diaphragms as one diaphragm moves the other over the cutter, thereby eliminating any air contamination. Again, defendant's expert on validity, a chemist, failed to produce clear and convincing evidence that Curtis renders the suit patent combination "obvious".

The non-file wrapper references cited by defendant add nothing to the references cited by the Patent Office, which are also relied on by defendant here. Brandau (the Aeroquip 5100 Series coupling), Cox and British Patent No. 555,692 (Greig) disclose other types of valve coupling construction; Brandau and Greig disclose spring-loaded poppet valves, of the type employed by defendant before development and attempted patenting of the 5700 Series valveless coupling. Cox contemplates a spring-biased flapper valve. None of the foregoing inventions discloses hermetic sealing diaphragms to reduce leakage in storage and transport. Furthermore, expert testimony at trial confirmed the leakage and flow resistance disadvantages of valve systems. Since a more pertinent valve construction (Curtis) was considered by the Patent Office, the foregoing references do not weaken the presumption of validity.

The other references relied upon are not persuasive because they concern non-analogous art and bear little relationship to the art of connecting closed pressure fluid systems. See *e. g.,* Copeman Laboratories Co. v. General Plastics Corporation, 149 F.2d 962 (7th Cir. 1945). Smith and Tash relate to the medical field and concern ampules and syringes. Young discloses an invention for a fountain pen, and Ward, Soffel and Harrocks deal with aerosal valves and cans. I find these references to be non-analogous and scattered prior art having no effect upon the presumption of validity.

In sum, the scope and content of the prior art included each individual element of the claims of the suit patent, i. e., conduits encased by diaphragms, diaphragm pierces, seals of one kind or another, and valve systems for regulating the flow of fluids under pressure. However, the Examiner determined, and the differences between the suit patent prior art references support the conclusion, that the combination of elements disclosed in the suit patent was beyond that which would be obvious to one of ordinary skill in the art. In fact, defendant's own expert failed to specifically state whether said combination would or would not have been obvious in 1955. Accordingly, the court finds that the claims in suit are not invalid for obviousness under § 103.

## II. Infringement

The issue of infringement involves the same claims found to be valid above. For purposes of analysis, the claims should be similarly grouped. The accused coupling is, of course, merely a modified version of the Aeroquip 5700 Series coupling upon which Aeroquip has paid royalties under the exclusive license agreement. There is no dispute that the claims in issue cover the 5700 Series couplings. Defendant takes the position, however, that the Modified "parent metal" 5700 Series couplings do not infringe the suit patent claims because (1) the parent metal coupling omits the stainless steel delta ring employed in the 5700 Series coupling as a "gasket means" between the brass coupling parts as they are tightened to a completed connection, and (2) the diaphragm of the female coupling part does not push the male diaphragm, which is not "separably secured" in all sizes of the accused coupling, over the cutter as disclosed by Claims 6, 9, 11, 14 and 15.

### A. Claims 1–4

Claims 1–4 have already been considered in some detail, and for purposes of the infringement issue, it will only be necessary to consider the significance of the "gasket means" element (number 6). The issue with respect to the infringement of Claims 1–4 is relatively simple.

Plaintiff argues that the modified coupling infringes the claims both literally and under the doctrine of equivalents. See Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608–609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Defendant asserts that the omission of a "gasket means" amounts to the omission of a material element of the invention relied upon by plaintiff to distinguish the invention from the prior art. Hence, defendant contends that there is no literal infringement and that the doctrine of equivalents is superseded in this case by the doctrine of "file wrapper estoppel". See, Trio Process Corporation v. L. Goldstein's Sons, Inc., 461 F.2d 66 (3d Cir. 1972).

This court would agree with defendant that the claims are not literally infringed. Plaintiff's expert, Mr. Magos, testified that a "gasket means" is "a static pressure seal which is accomplished by plastic deformation of one or both contacting faces of a joint". While he could not offer any authority in support of his definition, he opined that under the aforesaid definition, the final seal of the parent metal coupling would be a "gasket means". Hence, Mr. Magos took the position that a gasket means could be a metal-to-metal seal, although he admitted that a "gasket" is a separate entity.

First, the patent specification describes the final seal as follows [number designations are omitted]:

> "The ends of the body portions of the parts are preferably of conical mating formation to abut when the coupling is drawn up, and a *gasket* of any suitable material is provided to form a fluid-tight seal therebetween." (Emphasis added.)

This court is not persuaded by plaintiff's claim that a gasket can be made by integrating the final metal seal with the coupling part. If that were so, the term "gasket means" would be meaningless or indistinguishable from "sealing means" as disclosed in element 5 of the claims. That could not have been the invention intent.

However, there is a more significant reason for making a finding of non-infringement. At first blush, the doctrine of equivalents would seem particularly persuasive here. The mere omission of a gasket sealing means in place of a metal-to-metal seal does not change the fact that the same work is being accomplished in substantially the same way. Notwithstanding, the doctrine of file wrapper estoppel supersedes any claim of equivalency in this case. See, Henriksen v. Cory Corporation, 327 F.2d 409, 412 (7th Cir. 1964) ; Lewis v. Avco Mfg. Co., 228 F.2d 919, 923 (7th Cir. 1956).

"The doctrine of file-wrapper estoppel provides that where a patentee abandons or redrafts a claim more narrowly to avoid rejection on the basis of prior art, then the substance of the claim as originally drafted that was thereby excluded cannot be recaptured by resort to the doctrine of equivalents. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 123, 62 S.Ct. 513, 86 L.Ed. 736 (1942). Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Schmidinger v. Welsh, 383 F.2d 455 (3d Cir. 1967), cert. denied, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968); Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962).

"The doctrine is based on the theory that the prior art is either in the public domain or already patented, so that the patentee may not claim it as part of his invention. By redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims, and therefore will not be heard to assert, at a later date, what he disclaimed as his invention. Accordingly, for 'file-wrapper estoppel' to become operable, it is necessary, at the least, that a claim have been narrowed to avoid the prior art. Bishman Mfg. Co. v. Stewart-Warner Corp., 380 F.2d 336 (7th Cir.), cert. denied, 389 U.S. 897, 88 S.

**558**

Ct. 216, 19 L.Ed.2d 214 (1967)." 461 F.2d at 75.

Further, the element relied upon to avoid infringement must also have been relied upon to distinguish the claims from the prior art. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Shumaker v. Groboski Industries, Inc., 352 F.2d 837, 840 (7th Cir. 1965); Welsh v. Chernivsky, 342 F.2d 586, 590 (7th Cir. 1965).

█ It was noted above, see note 13, the claims in issue were initially rejected as fully met by Morrison. Since Claims 1–4 were found to be generic claims which read on Figs. 4–6 of the patent, it is clear from the file wrapper that the combination dynamic and static seal by a gasket means was intended to be a material inventive distinction over the prior art. Mr. Lange argued to the Examiner that "Morrison provides no seal even in that final position." Yet, Morrison at least contemplated a metal-to-metal contact seal. That much is apparent from the Morrison specification that the flared surface of the connecting member with the conic portion of the interposed disc when the union nut is tightened results in "effective sealing contact". The Examiner must certainly have recognized this in allowing the amended claims to stand. A final metal-to-metal seal would clearly read on Morrison. Hence, the gasket means is clearly a material and essential element of the amended claims. The combination of the O-ring dynamic seal with a metal gasket final seal was the critical distinguishing feature over the Morrison prior art patent. Accordingly, the claims cannot be expanded to cover a device omitting one of the essential features. Of course, the "[o]mission of one element or ingredient of a combination covered by any claim of a patent averts any charge of infringement based on that claim." See, Minnesota Mining & Mfg. Co. v. Permacel-LePage's, Inc., 334 F.2d 820, 823 (7th Cir. 1964); Edwards v. Hychex Products, 171 F.2d 259,

260 (7th Cir. 1948); Weller's Walker on Patents, Vol. 7 § 543 p. 324. Therefore, this court finds that the accused "parent metal" 5700 Series coupling does not literally infringe claims 1–4 of the suit patent, nor is the doctrine of equivalents applicable in this case.

### B. Claims 6, 9, 11, 14 and 15

The defense against the charge of infringement of Claims 6, 9, 11, 14 and 15 is based upon the fact that the diaphragm in the female coupling part of the accused coupling does not push the diaphragm in the male coupling over the cutter. It is also asserted that the "separable securement" required by the claims is not realized in any of the couplings except the size 12 and, in any event, that such separable securement is not necessary for the operation of the accused couplings.

█ At the close of plaintiff's case, defendant made a motion for a directed verdict as to Claims 5, 6, 9, 11, 14 and 15. Claim 5 was withdrawn for failure to prove that the accused coupling infringed the requirements of the claim, namely that the female diaphragm move the male diaphragm over the cutter. The other claims remained in suit. The only relevant distinction between Claim 5 and the other claims in issue is that Claims 6 and 9 employ the term "closing means", Claims 11 and 14 employ the term "disruptable members" and Claim 15 uses the term "penetrable means". Plaintiff's own claim charts show that there is no distinction between any of the terms used for purposes of distinguishing the diaphragm or hermetic seal from the rest of the coupling part. Accordingly, for the same reasons Claim 5 was withdrawn, proof of infringement of Claims 6, 9, 11, 14 and 15 failed. Furthermore, with respect to "separable securement", infringement was not proved on any of the manufactured sizes of the accused coupling except size 12.

### C. Marking Estoppel

As noted above, the civil action for infringement brought by Crane against

Aeroquip resulted in an exclusive license under the Bredtschneider patent by the terms of which Aeroquip was obligated to pay royalties to Crane on the sale of its 5700 Series couplings. There is no dispute that up to the time of trial, Aeroquip has tendered all royalties due Crane *on the* 5700 Series couplings. However, in 1969, Aeroquip initiated the manufacture and sale of a "modified" 5700 Series coupling under the designation "parent metal 5700 Series coupling". Aeroquip has maintained throughout that its manufacture and sale of the "parent metal" coupling did not create any royalty obligations under the license agreement because they are not covered by the claims of the suit patent.

Although Aeroquip admits that the modified couplings were marked with the patent number, Aeroquip failed to give Crane any notice of their manufacture and sale or to pay any royalties thereon. Crane did not discover the existence of the modified couplings until Aeroquip, on December 16, 1971, replied to an inquiry from Crane as to why royalty payments under the license agreement had substantially declined. The reply stated that a design [the modified couplings] "which had been sold for over two years" and represented "by far, the largest percentage of sales" was "not covered by the licensed patent". Aeroquip continued to mark both the 5700 Series couplings *and* the modified couplings with the suit patent number until sometime after November 30, 1972. There is evidence, however, that modified couplings marked with the patent number were on display at the Aeroquip booth in the International Heating and Air Conditioning Exposition held at McCormick Place, Chicago, Illinois, from January 29, 1973, to February 1, 1973. No evidence was produced by defendant explaining its reasons for marking the modified couplings from the outset with the patent number. Defendant's product engineer, Mr. Ritchie, simply testified that six months or so before his November, 1972, deposition, he orally instructed someone to stop production of the modified couplings with the patent marking but the order was not carried out.

In denying plaintiff's pretrial motion for partial summary judgment as to royalties, this court stated:

"The validity of the patent must be determined before there can be liability for unpaid royalties on goods sold by the licensee under the patent license, even though the goods are clearly within the scope of the patent and marked with the patent number. There is no rational reason why the rule should be any different for goods arguably outside the coverage of the patent, but marked with the patent number. Finally, there is no suggestion in *Lear* [Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610], or any cases that have come to the attention of this court, that a prerequisite, under *Lear,* for avoidance of royalties while waiting to be sued for infringement is that the licensee *must* refrain from marking any of its products with the patent number.

"A separate question may arise later in the event the patent is held valid but not applicable to the 'modified' couplings. Nothing that has been said in this opinion would interfere with the application of the general rule that marking with a patent number will estop the marker from denying that the marked product is within the scope of the patent. See, e. g., Gridiron Steel Co. v. Jones & Laughlin Steel Corp., 361 F.2d 791, 797 (6th Cir. 1966)." 356 F.Supp. at 741.

Having decided that the suit patent is valid but not infringed by the structure of the modified coupling, it is necessary at this point to consider the legal effect of defendant's marking of the accused coupling with the patent number. Plaintiff again asserts that defendant is estopped to deny royalty liability for or infringement by the accused couplings because said couplings were manufactured and sold bearing the suit patent number. In fact, there is no dispute that at least under *some* circum-

stances, marking a product with a patent number will estop the marking party from asserting that the product is not covered by the patent. See, Gridiron Steel Co. v. Jones & Laughlin Steel Corp., 361 F.2d 791, 796–797 (6th Cir. 1966); Collis Co. v. Consolidated Machine Tool Corp., 41 F.2d 641, 645 (8th Cir. 1930); Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 32 F.2d 882, 885 (6th Cir.), cert. denied, 281 U.S. 735, 50 S.Ct. 249, 74 L.Ed. 1150 (1929); Piaget Novelty Co. v. Headley, 108 F. 870 (2d Cir. 1901); Kraly v. National Distillers & Chemical Corp., 173 U.S.P.Q. 56, 59 (N.D.Ill.1972); Canaan Products, Inc. v. Edward Don & Co., 273 F.Supp. 492, 502 (N.D.Ill.), aff'd, 388 F.2d 540 (7th Cir. 1968); Touchett v. E Z Paintr Corp., 150 F.Supp. 384, 391 (E.D.Wisc.1957); Dwight & Lloyd S. Co. v. American Ore Reclamation Co., 44 F.Supp. 401, 402 (S.D.N.Y.1941); Lathrop v. Rice & Adams Corp., 17 F.Supp. 622, 626 (W.D.N.Y.1936). The foregoing cases establish the general rule that marking a product with a patent number estops the marking party from either avoiding royalty liability or asserting non-infringement in an action by the patentee. A corollary of the rule seems to be that discontinuance of marking will not obviate or cure the estoppel. Gridiron Steel Co. v. Jones & Laughlin Steel Corp., *supra*; Canaan Products, Inc. v. Edward Don & Co., *supra*; Dwight & Lloyd S. Co. v. American Ore Reclamation Co., *supra*. But *cf.* Touchett v. E Z Paintr Corporation, *supra*.

Further, it is clear that in a suit for royalties:

" . . . the licensee has a defense if the product he is making and selling does not come within the scope of any claim of the patent. The licensee is required, however, to pay royalties not only on the invention disclosed in the patent but also on whatever is sufficiently similar thereto as to constitute infringement of the patent." Maxon v. Maxon Construction Co., 395 F.2d 330, 331 (6th Cir. 1968).

Therefore, if defendant is estopped to deny that the modified couplings are covered by the claims in suit, irrespective of whether they *in fact* are, defendant will be liable for royalties on said couplings.

■ Defendant states, however, that even if the claims in suit are valid, the marking has no legal effect absent any evidence of *wrongful* intent. While wrongful intent has been held to be a necessary element of proof in patent "mismarking" cases under 35 U.S.C. § 292, see Brose v. Sears, Roebuck & Co., 455 F.2d 763, 765 (5th Cir. 1972), defendant has failed to cite any authority, nor has the court found any, establishing a similar requirement in "marking estoppel" cases. Nor does an intent requirement seem justified in light of the fact that a "penal statute" is not involved in marking estoppel situations. *Cf.* Brose v. Sears, Roebuck & Co., *supra*. Furthermore, it has long been settled that intent or knowledge is not material to the issue of patent infringement. Cummins Engine Company v. General Motors Corp., 299 F.Supp. 59, 92 (D.Md.), aff'd, 424 F.2d 1368 (4th Cir. 1970). See also, Deller's Walker on Patents Vol. 7 § 514 p. 178. Similarly, the cases recognizing the marking estoppel doctrine fail to suggest any requirement of proving wrongful intent.

■ Even assuming, however, that wrongful intent is required, as defendant contends, it is the opinion of this court that the circumstances of the marking in this case compel the conclusion that there was a specific intent to mark the accused devices and represent them as protected by a patent.

The settlement of the 1967 lawsuit, which resulted in the exclusive license agreement, required defendant to pay royalties on couplings it had previously been producing. There can be little question that the advent of the "modified" couplings was in large measure spurred by a desire to avoid payment of royalties under the license agreement. The evidence is clear that defendant carefully determined whether the accused coupling was outside the scope of the patent covering the exclusive license agreement. Yet, notwithstanding de-

fendant's effort to manufacture and sell a coupling outside the scope of the patent, it marked the "modified" couplings with the patent number for almost three years and even presented the marked product at a recent trade show. To argue that the circumstances leave any room for finding that defendant's actions were "unintentional" defies logic. Indeed, it is difficult to believe that marking a product with a patent number, especially when it is the manufacturer's specific conclusion that the product is not covered by the same patent, could ever be unintentional if it continues for anything longer than a very short period of time. Hence, I find defendant's "intent" defense insufficient in fact, as well as in law.

The rule established by the cases cited above dictates the result in this case. In view of defendant's manufacturing and marketing of the accused coupling marked with the suit patent number, defendant is estopped to deny that it is liable for royalties on said couplings. Finally, it should be recognized that application of the marking estoppel doctrine in this case should have an important therapeutic function in protecting the public interest. Manufacturers should be on notice that care must be taken in avoiding misrepresentation to the public that goods are protected by a patent.

 For the reasons set forth in Part III of this opinion, defendant's royalty obligations for the "modified" couplings will be governed by the existing license agreement.

### III. Termination

 Before the trial, plaintiff moved for partial summary judgment terminating the license agreement. The issue was considered at length by this court, and it was held that under the undisputed facts the license should not be terminated. See, 356 F.Supp. at 737–740. The trial did not disclose any new facts relevant to the termination issue. As should be apparent from the discussion of the infringement issue, there were grounds for reasonable men to differ as to whether the "modified" couplings were covered by the claims of the suit patent. This court has found that defendant owes plaintiff royalties for the "modified" couplings on the basis of the fact that for a period of almost three years defendant marked the couplings with the patent number and, in effect, represented to the public that the couplings were protected by a patent. However, the failure to pay royalties on the accused couplings is not sufficient ground for allowing plaintiff to unilaterally terminate the license agreement. Of course, if defendant subsequently refuses to pay royalties on the modified couplings, plaintiff can take whatever action is necessary, either under the procedure set forth in Section 7 of the license agreement or in court. But if all royalties are paid, then plaintiff's argument that there has been a failure of consideration or a frustration of purpose is without merit. The main purpose and consideration behind granting a patent license is to receive all just royalties for practice of the patent. Hence, while an honest dispute as to the coverage of the patent license resulted in a lawsuit, the ultimate basis for the agreement has not been undermined. Furthermore, the fact that plaintiff felt compelled to prosecute a lawsuit does not change the result. For the foregoing reasons, defendant's obligations to pay royalties on the modified couplings will be governed by the terms of the license agreement. Finally, for the reasons set forth in this court's memorandum opinion of March 13, 1973, plaintiff's request for a declaratory judgment terminating the license agreement will be denied.

### IV. Attorney's Fees and Special Damages

 As this is not an "exceptional" case for purposes of either 35 U.S.C. § 284 or 35 U.S.C. § 285, plaintiff's request for attorney's fees and special damages will be denied. However, under the circumstances of this case, costs will be assessed against defendant.