**EMPIRE IRON WORKS, INC., d/b/a Armorgard, Plaintiff,**

v.

**DEFENDER, INC., Defendant.**

No. 93–CV–74289–DT.

United States District Court, E.D. Michigan, Southern Division.

July 24, 1997.

 

Barry Fayne, Southfield, MI, Charles W. Chandler, Livonia, MI, for Empire Iron Works, Incorporated dba Amorgard, plaintiff.

Douglas W. Sprinkle, Gifford, Krass, Birmingham, MI, for Defender, Incorporated, defendant.

### MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

### INTRODUCTION

Plaintiff Empire Iron Works, Inc. ("Empire") brought this action against its competitor, Defendant Defender, Inc. ("Defender") alleging that Defender was infringing Em-

pire's rights under United States Patent No. 4,644,688. Empire produces a patented security door which allows a homeowner to escape from a residence in the event of fire or other emergency. This door is the subject of the lawsuit. The matter proceeded to a bench trial. The Court here makes the following findings of fact and conclusions of law.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 2201, 2202 and 1338. There is no dispute regarding jurisdiction.

## STATEMENT OF FACTS

Empire d/b/a Armorgard, is a Michigan corporation. Empire's principal place of business is located at 14999 Telegraph Road in Redford, Michigan. Empire conducts business at a plant on Prairie Street in Detroit. It is one of the largest manufacturers of security doors in the area. Empire sells these doors through outlets in metropolitan Detroit and other states. Isaac ben Ezra and David ben Ezra are the principals of Empire.

Defender, Inc. is a Michigan corporation with its principal place of business at 486 W. Eight Mile Road in Hazel Park, Michigan. Defendant also sells security doors.

The doors manufactured by Plaintiff and Defendant are security storm doors generally used outside the main residential door, front, side or back. These doors consist of a steel framework with a glass or plastic plate on the interior side. The security door swings outward while the residence primary door swings inward. A key is generally used to lock and unlock on the inside and the outside of the door. The removal of the key after locking the door creates a dangerous circumstance in the event of fire or other emergency. Leaving the key in the lock allows for the opportunity that an intruder could break the plastic or glass plate, turn the key and gain entry. Some doors are made with an inside thumb turn knob for locking and unlocking. While this mechanism alleviates the emergency safety hazard it does not secure the residence from an intruder.

Lawrence Benderoff invented a security door that protects the inside lock or turn knob. Mr. Benderoff was issued U.S. Patent No. 4,644,688 (" '688") for his invention on February 24, 1987. Mr. Benderoff assigned the rights under his patent to Empire on August 14, 1990. Empire successfully sells doors with this invention as a "fire escape and burglar protection" door. Empire door's Armor Shield is a brass collar or cuff attached to the inside of the security door around the keyhole and door knob spanning the space between the security door and primary door. The collar protects the keyhole or knob against an intruder's reach behind the door.

Defendant installed several doors with an Empire marked collar to protect the thumb turn portion of a single cylinder dead bolt. Defender admits selling eight such doors using Empire's metal collars purchased from Empire before the lawsuit and from an unauthorized Empire employee after the lawsuit.

Plaintiff notified Defendant's owner, Barry Gibbs, of the alleged infringement of Empire's patent. In October 1994 Plaintiff filed this lawsuit seeking an injunction against Defender's sale of the infringing security doors. No money damages have been sought.

## ANALYSIS

### I. The Patent

The Empire patent, the patent-in-suit, has eleven claims. Of these claims, three are independent, Claims 1, 8 and 10. These claims state:

1. A lockable security door having a means immediately available to occupants of a building for locking and unlocking said security door comprising, in combination:

(a) a security panel adapted for being pivotally mounted in the entranceway of a building forward of, in spaced apart relationship to a prime outer door of the building;

(b) a means for pivotally mounting the security panel to the entranceway of the building;

(c) a *key lock* mounted in the security panel for locking and unlocking the security door, said key lock *having a lock cylinder mounted in the rear portion of*

the security panel for receiving a key to lock and unlock the security door; and

(d) a rearward opening housing surrounding the lock cylinder for enclosing the key, said housing having a length which substantially spans the space between the prime outer door and the security door when both doors are in their closed positions whereby when a spare key is inserted into and kept in the locked cylinder, the key is in plain view when the prime door is open and is immediately available to occupants of the building for locking and unlocking the security door, but when the prime door is closed, the key is out of view of and inaccessible to persons attempting to unlawfully enter said building (emphasis added).

\* \* \* \* \* \*

8. *A double cylinder key type lock security door guard* having a means immediately available to occupants for locking and unlocking said security door comprising, in combination:

(a) a rectangular shaped grille panel adapted for being pivotally mounted forward of and spaced apart from a prime outer door of a building comprising a rectangular frame having slender rod-like interconnected members, said members comprising a first vertical outer dismember for housing a lock, a second vertical outer sidemember space apart from and parallel to said first vertical outer sidemember, and space apart parallel upper, center and lower horizontal members disposed between and fixedly attached to said vertical frame members and a plurality of spaced apart parallel members spanning the space between said grille panel frame members fixedly attached at the ends thereof to the members of said grille panel frame;

(b) a means for pivotally mounting said grille panel to the frame of the entranceway of said corresponding prime outer door;

(c) a *double cylinder dead bolt key lock* mounted in one of said grille panel vertical rectangular outer sidemembers;

(d) *a key engaging the rearmost cylinder* of said lock; and

(e) *a rearward opening housing entirely enclosing said key* and being of a length substantially spanning the space between said corresponding prime outer door and said security door when said doors are in closed positions whereby said key is in plain view and immediately available to occupants of a building when said prime outer door is opened for locking and unlocking said lock but out of view of and inaccessible to persons attempting to unlawfully enter said building when said prime outer door is closed (emphasis added).

\* \* \* \* \* \*

10. *In a security door having a double cylinder key type lock* spaced apart from and positioned forward of a prime outer door of a building a means in plain view immediately available to occupants of said building for locking and unlocking said lock when said prime outer door is in an open position comprising a rearward opening *tubular housing* fixedly attached to the security door having a length substantially spanning the space between the security door and prime outer door *for storing a key and a key within said housing* engaging said lock (emphasis added).

These claims refer to a "key," "keylock," "a double cylinder key type lock," and a "spare key."

At trial, sample doors were brought to court for the Court to observe how the mechanism operated in the door. (Trial Exhibit No. 15–A.) The Summary of the Invention included in the Patent suggests the following objectives of the security door:

It is a primary object of the present invention to provide a means in a security door having a double cylinder key lock for unlocking the security door during emergency egress from the building which is in plain view of and immediately available to occupants but out of view of and inaccessible to persons attempting to unlawfully enter said building.

It is another object in addition to the foregoing object to provide in a security

door having a double cylinder key lock, a convenient means for storing a spare key which is in plain view of and immediately available to occupants of a building for locking the security door so as to enhance the security of the building without being in plain view of and accessible to persons attempting to unlawfully enter said building.

It is another object in addition to the foregoing objects to provide a low cost affordable means of insuring the safe emergency egress of all occupants of a building equipped with security doors having double cylinder key locks.

('688 Patent, Summary of the Invention, lines 20–39).

## II. *Patent Validity*

■ Rights under a patent are defined in Title 35 of the United States Code. A patent is presumed to be valid under 35 U.S.C. § 282:

A patent is presumed valid.... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

Defendant claims Plaintiff's '688 patent is not valid because it was non novel and obvious and because it was offered for sale prior to the date of Plaintiff's patent. Under 25 U.S.C. §§ 102(a) and 102(b), a patent is not valid if the invention was "known or used by others" ... "or described in a printed publication ..."

At trial, Defendant presented the testimony of Mr. Martin Nichols. Mr. Nichols is an expert metalsmith with years of experience working with locking devices. Mr. Nichols testified that, in the early 1980's or late '70's, he began constructing metal doors with a covering or shield, a collar of sorts, around the locking device. The locking device he used was a double cylinder lock. He testified he stopped making the doors in the early to mid 1980's. No proof other than Mr. Nichols' testimony was offered in this regard. In *Code–Alarm, Inc. v. Electromotive Technologies Corp.*, 26 U.S.P.Q .2d 1561, 1567, 1992 WL 494716 (E.D.Mich.1992), Judge Gilmore of this Court wrote:

In light of the vague nature of the testimony and the lack of physical or documentary evidence to support Code Alarm's position, the Court finds Code Alarm has failed to establish prior public use within the meaning of Section 102(b).

This Court does not find the testimony of Mr. Nichols sufficient to support a finding of invalidity with respect to Plaintiff's patent. No additional proof was submitted by Defendant to support its allegation that Plaintiff's patent is invalid. Defendant has not overcome the presumption that Plaintiff's patent is valid.

## III. *Infringement*

### A. *Literal Infringement*

The burden of proving infringement of a patent rests with the patent owner. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 219 U.S.P.Q. 473, 480 (Fed.Cir.1983). A patent is infringed when someone makes, uses, offers to sell or sells the patented invention without permission of the patent owner during the life of the patent, 35 U.S.C. § 271(a). If any of the patent claims cover the claimed infringing product, then there is infringement. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 889 (Fed.Cir. 1988). The Court, before making a determination, must define what the words in the claims of the patent mean as a matter of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977–79 (Fed.Cir.1995); *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822–23 (Fed.Cir. 1992). The Court decides what the words in a claim mean by looking at the patent's written description, specification, drawings, prosecution history and expert testimony, if available. *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991); *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987).

■ Next, the Court determines if the claim, as interpreted, covers the alleged infringing product. If all of the elements of the claim are found or read on the alleged infringing product, then there is literal infringement. *Key Mfg. Group, Inc. v. Microdot, Inc.,* 679 F.Supp. 648, 660 (E.D.Mich.

1987), *rev'd on other grounds*, 925 F.2d 1444 (Fed.Cir.1991).

Plaintiff claims Defendant's security door directly infringes on its product. At issue is only Claim 10. Claim 10 requires a double cylinder key-type lock. This interpretation was supported by the testimony of Mr. Isaac ben Ezra of Empire. Mr. ben Ezra noted all the elements of Claim 10 in Plaintiff's Exhibit 15–A, a model of the security door with a double cylinder lock. A model of a security door with a single cylinder lock was admitted as Exhibit 15–B. Mr. ben Ezra could not note all the elements of Claim 10 on the single cylinder lock security. However, the only difference was the locking device. Defendant argues there is no literal infringement of the '688 patent because the security door Defendant made had a single cylinder lock and therefore does not read on each element of Claim 10.

Based on the testimony and evidence presented at trial, the Court finds there is no literal infringement of the Empire patent. Defendant's expert could not note that all the elements of Claim 10 could be found in the single cylinder lock. Plaintiff has not met its burden that Defendant's single cylinder lock security door literally infringed Plaintiff's Claim 10.

### B. *Doctrine of Equivalents*

Plaintiff has also claimed infringement under the doctrine of equivalents. The doctrine of equivalents as a means of proving infringement of a patent was upheld by the Supreme Court in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The Supreme Court found that the "modern contours" of the doctrine of equivalents established in *Graver Tank & Mfg. Co. Inc. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), were not inconsistent with the 1952 revision of the Patent Act, 35 U.S.C. § 100 *et seq.* Under the doctrine of equivalents, a product which does not literally infringe the claims of a patent may be found to be infringing "if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."

*Hilton Davis*, 520 U.S. at ——, 117 S.Ct. at 1045. The Supreme Court wrote regarding the application of the doctrine of equivalents:

> Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.

*Id.* at 1049. The Empire door patent '688 Claim 10 must then be reviewed to determine if the element "double cylinder key lock" is equivalent to a "single cylinder lock" and whether the phrase "... for storing a key and a key within said housing engaging said lock" is equivalent to the thumb turn of a single cylinder dead bolt lock.

Plaintiff acknowledges that the doctrine of equivalents is available when literal infringement has not been shown. The doctrine of equivalents protects a patentee from devices or products that perform substantially the same function in substantially the same way for substantially the same purpose or to achieve the same result and which incorporate only insubstantial modifications to the patent. *Graver Tank, supra*, 339 U.S. at 608. Plaintiff argues that Defendant's infringing door is precisely the same as that in its patent except that a single cylinder lock with a thumb turn is located on the inside of the door within the tubular housing instead of a double cylinder lock and key. Plaintiff claims this door performs the same purpose protecting the inside locking/unlocking mechanism, whether a double cylinder lock with a key on the inside or a single cylinder lock with a thumb turn on the inside, from access from the outside. Plaintiff further claims the infringing door functions in the same way. A tubular housing of the inside key lock or thumb turn which spans the distance between the security door and the inner door prevents an intruder from reaching through the security door steel framework to access the inside key lock or thumb turn and opening the door. At the same time, it allows the homeowner the ability to leave the key in the lock in the case of a double cylinder lock. A thumb turn is used in the case of a single cylinder lock. In each case, increased protection of the homeowner results not only

from preventing intruders but as a means of securing an easy escape in the event of fire or emergency. Increased protection in the event of fire or emergency results from the homeowner's comfort in leaving the inner key in the door or using a thumb turn because the inside locking mechanism is secure.

Defendant argues that there is no infringement under the doctrine of equivalents. Defendant claims that a double cylinder lock and a single cylinder lock are not equivalents and that a thumb turn does not function in a fashion similar to a key. Defendant's witness, Mr. Martin Nichols, is a metalsmith with a wealth of experience in the industry. He has done business with both Defendant and Plaintiff. Mr. Nichols testified that the ability to remove the key is the main difference between a double cylinder lock and a single cylinder lock. Mr. Gibbs, owner of Defender, Inc., testified that the thumb turn and key provide different levels of protection with respect to intruders and fire or emergency exit. Mr. Gibbs noted that fire or emergency exit is always protected and available when a single cylinder lock with a thumb turn is used. However, with a double cylinder lock, the key can always be removed thereby thwarting fire or emergency exit even with the Empire door's Armor Shield. Conversely, the double cylinder lock is best for intruder protection since removal of the key prevents a thief from gaining entry by the door or from easily exiting by using the thumb turn on the security door from the inside. Mr. Ben Ezra's testimony supports the increased burglar protection from the double cylinder lock.

The Empire patent was designed to protect the inner locking device and key from access from the outside, while allowing the homeowner to leave the key in the lock to allow for fire or emergency exit. Those seeking to remove the key each time have no use for the Armor Shield device on the door. The Court finds Defendant's evidence and argument are insufficient.

Defendant also argues that Plaintiff should have to show "bad equity" in anticipation of the Supreme Court's decision in *Hilton Davis*. The Supreme Court's opinion in *Hilton Davis* upheld the doctrine of equivalents.

The Court noted the doctrine must be applied element by element, but did not require that the Plaintiff prove intent to infringe. 520 U.S. at ——, ——, 117 S.Ct. at 1049, 1052.

> Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.

*Id.* at 1049.

> Although *Graver Tank* certainly leaves room for petitioner's suggested inclusion of intent-based elements in the doctrine of equivalents, we do not read it as requiring them. The better view ... is that intent plays no role in the application of the doctrine of equivalents.

*Id.* at 1052.

The Court finds in favor of Plaintiff as to infringement based on the doctrine of equivalents. Defendant's door performs the same purpose of protecting the inside locking/unlocking mechanism from access from the outside. The same function of the tubular housing is used. The only difference is when a double cylinder lock is used, a key may be left in the lock. In the single cylinder lock, a thumb turn is used.

### C. *Estoppel & Implied License*

Plaintiff asserts that Defendant is estopped from challenging Plaintiff's claim of infringement. Plaintiff argues that because Defendant used Plaintiff's part (the collar or cuff) marked with Plaintiff's patent number in the production of Defendant's infringing door Defendant is estopped from challenging infringement. *Collis Co. v. Consolidated Machine Tool Corp. of America*, 41 F.2d 641, 6 U.S.P.Q. 109, 113 (8th Cir.1930). Consistent with patent law, intent is not required in a case of "marking estoppel." *Crane Co. v. Aeroquip Corp.*, 364 F.Supp. 547, 179 U.S.P.Q. 596 (N.D.Ill.1973). However, Plaintiff argues that Defendant's bold purchase of Empire's marked component both before and after the notice of patent infringement and this lawsuit, shows clear intent. Plaintiff claims "if Defendant simply wanted a collar,

they could have purchased a piece of muffler pipe." (Plaintiff's Trial brief, p. 7.)

In response, Defendant first claims there was no wrongful intent in its purchase of six to eight collars from Plaintiff. Defendant claims the collars were offered for sale by Plaintiff and, in the course of free enterprise, Defendant purchased them. Defendant claims Plaintiff's patent number was already marked on the collar at the time of purchase.

Secondly, Defendant claims that, by offering its marked Armor Shield collar for sale, Plaintiff gave an implied license to the purchaser for use of its product. In *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 3 U.S.P.Q.2d 1288 (Fed.Cir.1987), the Federal Circuit wrote:

> Having sold the product unmarked, DFM could hardly maintain entitlement to damages for its use by a purchaser uninformed that such use would violate DFM's method patent.

*Id.*, 822 F.2d 1062, 3 U.S.P.Q.2d at 1292. It must be noted that in *Devices*, the product was unmarked. Defendant also cites *Unidisco, Inc. v. Schattner*, 824 F.2d 965, 3 U.S.P.Q.2d 1439 (Fed.Cir.1987) in which the court found a licensee's resale of a product did not infringe the patent when the product had been purchased from an authorized seller. *Id.*, 824 F.2d 965, 3 U.S.P.Q.2d at 1441. However, in that case, the product was licensed to the accused infringer. These cases cited by Defendant do not speak directly to the facts in this case. Here, Defendant purchased the alleged infringing collars from Plaintiff. These collars were marked with Plaintiff's patent numbers. The purchase was at a profit to Plaintiff. Plaintiff claims it sold the collars as replacement parts for its own doors. The circumstances of Defendant's purchases, especially after the lawsuit was filed, are suspicious given the testimony at trial. Defendant then incorporated the collars into its own doors and offered them for sale. In this case, there was no implied license to Defendant to incorporate Plaintiff's device into its own doors and offer them for sale. A license is not implied when a product has other noninfringing uses, such as replacement parts. *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 925, 223 U.S.P.Q. 982, 998 (Fed.Cir.1984).

> A mere sale does not impart a license except where the circumstances plainly indicate that the grant of a license should be inferred.

*Hunt v. Armour & Co.*, 185 F.2d 722, 729, 88 U.S.P.Q. 53, 58 (7th Cir.1950).

Based on the above, the Court finds that Defendant had no implied license to incorporate Plaintiff's marked collar into Defendant's door. Plaintiff's sale of the collars to Defendant did not grant Defendant the license to incorporate the collar into its doors and offer them for sale. The collars sold by Plaintiff were marked with a patent number. Plaintiff was not on notice that Defendant would incorporate Plaintiff's device into Defendant's own door.

**D.  *Willful Infringement and Attorney Fees***

Plaintiff argues that Defendant willfully infringed its patent and Plaintiff is therefore entitled to attorney fees under 35 U.S.C. § 285. The Federal Circuit has stated the following factors are relevant in an analysis for willful infringement:

1) Whether the infringer copied;

2) Whether the infringer had a good faith belief that no infringement occurred or of the invalidity of the patent;

3) The infringer's behavior as a litigant;

4) The defendant's size and financial condition;

5) The closeness of the case;

6) The duration of defendant's misconduct;

7) The remedial action by the defendant;

8) The defendant's motivation for harm; and

9) Whether the defendant attempted to conceal its misconduct.

*Read, supra,* 970 F.2d at 826; *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir. 1986). Each case requires an examination of the "totality of the circumstances." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed.Cir.1992).

In this case, Defendant can be said to have copied Plaintiff's security door varying only the type of locking mechanism used. However, the Court finds Defendant initially believed in good faith there was no infringement because the patented marked part was sold by Empire and Defendant believed in good faith that the use of a single cylinder door lock made its door substantially different from Empire's door. Defendant's behavior as a litigant and remedial action by Defendant may be questioned with respect to its purchase of the patented part and its incorporation into a Defender security door following the initiation of this lawsuit. As to the size and financial condition of the Defendant and the duration of Defendant's misconduct, it must be noted that at the time of this lawsuit, Defendant had sold relatively few of these doors. It is not clear from the evidence that Defendant acted for the purpose of harming the Plaintiff or stealing their business. Nor did Defendant attempt to conceal its behavior. For example, Defendant did not attempt to obliterate or disguise Empire's patent number on the parts it purchased and installed on its doors. Relative to the "closeness of the case," whether such a collar or cuff on a lock is obvious was not sufficiently demonstrated at trial. Nor was it sufficiently shown that prior art existed. The issue of implied license by open sale of the cuff as a replacement part is a narrow question. However, the Court found Plaintiff prevailed on that issue on the facts of the case and the applicable case law. Based upon the evidence at trial and considering the totality of the circumstances, the Court finds that Defendant did not willfully infringe Plaintiff's patent.

The Patent Act provides a fee-shifting provision for awarding attorney fees to the prevailing party. The Court may award reasonable attorney fees to the prevailing party in exceptional cases only. 35 U.S.C. § 285. Where a patentee prevails on the merits, a finding of willful infringement may be the basis for an exceptional case. *Amsted Indus., Inc. v. Buckeye Steel Castings Co. .*, 24 F.3d 178, 184 (Fed.Cir.1994). In a case where the accused infringer prevails, an exceptional case may be found where there is bad faith litigation or fraud or inequitable conduct by the patentee in procuring the patent. *Cambridge Prods. Ltd. v. Penn Nutrients, Inc.,* 962 F.2d 1048, 1050–51 (Fed. Cir.1992).

Here, the patentee prevailed on its doctrine of equivalents claim only. The evidence does not support any allegation by Defendant that Plaintiff was involved in bad faith litigation or fraud or inequitable conduct when Plaintiff procured its patent. The Court finds that the instant case is not an exceptional case pursuant to 35 U.S.C. § 285. In addition, the Court did not find that Defendant willfully infringed Plaintiff's patent. Plaintiff is not entitled to attorney fees in this action.

### CONCLUSION

The Court finds that Plaintiff's '688 patent is valid. Defendant has not literally infringed the '688 patent. However, the Court finds that Defendant has infringed the '688 patent under the doctrine of equivalents. Plaintiff is not estopped from asserting its patent based on the estoppel or implied license theory. Finally, because the Court finds that Defendant did not willfully infringe Plaintiff's patent, Plaintiff is not entitled to attorney fees in this action.

Accordingly,

IT IS ORDERED that Defendant is permanently enjoined from incorporating Plaintiff's collar under the '688 patent for use in Defendant's door and from selling the doors with the incorporated collar.

IT IS FURTHER ORDERED that no attorney fees is awarded to Plaintiff in this action.